# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

Joseph M. Pallipurath, Pro se
SBI#431700E/SN#692025
New Jersey State Prison
P.O. Box 861
Trenton, NJ 08625

......................................
                                    :
JOSEPH M. PALLIPURATH, individually, and   :
on behalf of all others similarly situated,:
                                    :
          Plaintiff,                :
                                    :    CIVIL COMPLAINT
     v.                             :
                                    :    Civil Action
                                    :    No.:_____
NEW JERSEY DEPARTMENT OF CORRECTIONS;   :
HAVIS Inc.; UNIVERSITY CORRECTIONAL HEALTH  :
CARE, RUTGERS, THE STATE UNIVERSITY OF NEW  :
JERSEY; GARY LANIGAN; MARCUS O. HICKS;   :
SUSAN SPINGLER: Dr. NWACHUKWU; DIANE BACA;  :
SHARON R. GRAHAM; TIFFANY FAIRWEATHER; AMY  :
EMRICH; CINDY FORD; CRAIG SEARS; MAGGIE   :
REED; JONATHAN GRAMP; AKEISH WATTERS;    :
RICHARD DEFAZIO; XIANGRONG ZHOU; FATHOM   :
BORG; MERVIN GENESH; Ofc. Witfield; Ebo   :
MOBOLANLE EBO; Ofc. LEWIES;  Ofc. MERREL;  :
Ofc. BECKER; Dr. ROBIN MILLER; Dr. COFFMAN;:
PAULO VERDEFLOR; JOHN/JANE DOE (CEO of    :
HAVIS Inc.; JOHN/JANE DOE-1 to 43;       :
SHARON AKER; BRUC DAVIS; et al.;         :
                                    :
          Defendants.               :
......................................:

VERIFIED COMPLAINT FOR MONETARY DAMAGES AND INJUCTION
PURSUANT TO U.S.C. § 1983, et seq.

JURY TIRAL REQUESTED

Plaintiff alleges as follows upon personal belief and on information and on belief as to all other matters:

### PRELIMINARY STATEMENT

1. This is a clivil complaint brought by plaintiff against the defendants' for the severe back and neck injuries plaintiff sustained in the New Jersey Department of Corrections ("NJDOC") transportation vans (A/K/A "Dog Pound" or "Dog Cage"), hereinafter referred to as "NJDOC Van"; and for delaying proper medical treatments for the injuries suffered in the NJDOC vans in retaliation  and for non-medical reasons.

2. Between the years of 2014 to present, plaintiff was transported to and from Court and hospital in the NJDOC vans. During each prolonged transportation, plaintiff was  placed in the back of  the NJDOC vans' compartments designed defectively without adequate safety features. As a result, plaintiff suffered various painful injry to his back and neck in many form, shape, and manner when the NJDOC vans  was in motion from "rough ride assaults" and from reckless driving by the NJDOC transport officers.

3. The plaintiff bring this action under 42 U.S.C § 1983, the First and the Eighth and Fourteen Amendments of the United States Constitution; 29 U.S.C. § 504 (the Rehabiliation Act); 42 U.S.C. § 12132 (the Amercians with Disabilites Act of 1990); New Jersey Products Liability Act; and any/all applicable Federal and State Laws (to be raised with the assitance of a counsel).

### JURISDICTION

4. This Court has jurisiction over the subject matter of this lawsuit pursuant to 24 U.S.C. §1331, 1343(a) and 1367(a).

5. Venue in the District of New Jersey is proper. Plaintiff resides in the District of New Jersey, and all events relevant to this action occurred in the District of New Jersey.

PARTIES

PLAINTIFF

6. The plaintiff is a citizen of the United States with mental disorders and with a life long injury to C5-C6 level who is confined in New Jersey State Prison ("NJSP").

7. The plaintiff is "handicapped" individual as that term is defined in 29 U.S.C. § 706(8)(B) and 42 U.S.C. § 12102.

8. NJDOC receives Federal assistance.

DEFENDANT

9. John/Jane Doe (Chief Executive Officer ("CEO")), (to be named upon Discovery) of Havis Inc., 75 Jacksonville Road, Warminster, PA 18974 is named in his/her individual and official capacity;

10. Gary M. Lanigan, the Commissioner of NJDOC is named in his individual and official capacity;

11. Marcus Hicks, is the Acting Commissioner of NJDOC is named in his individual and official capacity;

12. John/Jane Doe-39 (to be named upon Discovery) is the assistant commissioner, Division of Operation, and is named in his individual and official capacity;

13. John/Jane Doe-40 (to be named upon Discovery) is the Director of the Office of Institutional Support Services (O.I.S.S.) is named in his individual and official capacity;

14. John/Jane Doe-41 (to be named upon Discovery) is the NJDOC Official who is in charge of ordering and purchasing safe NJDOC vans for inmates transportation is named in his individual and official capacity;

15. John/Jane Doe-42 (to be named upon Discovery) is the NJDOC official in charge for inspecting the NJDOC vans for transportation worthy and for all the transportation safety requirements is named in his individual and official capacity;

16. Bruce Davis is the Administrator of the New Jersey State Prison ("NJSP") is named in his individual and official capacity;

17. Amy Emrich is the Assistant Administrator of NJSP is named in her individaul and official capacity;

18. NJDOC Transpoart Officer John Doe-1 (to be named upon Discovery) is named in his individual and official capacity;

19. NJDOC Transport Officer John Doe-2 (to be named upon Discovery) is named in his individual and official capacity;

20. NJDOC Transport Officer John Doe-3 (to be named upon Discovery) is named in his individual and official capacity;

21. NJDOC Transport Officer John Doe-7 (to be named upon Discovery) is named in his individual and official capacity;

20. NJDOC Transport Officer John Doe-9 (to be named upon Discovery) is named in his individual and official capacity;

21. NJDOC Transport Officer John Doe-10 (to be named upon Discovery) is named in his individual and official capacity;

22. NJDOC Transport Officer John Doe-12 (to be named upon Discovery) is named in his individual and official capacity;

23. NJDOC Transport Officer John Doe-13 (to be named upon Discovery) is named in his individual and official capacity;

24. NJDOC Transport Officer John Doe-14 (to be named upon Discovery) is named in his individual and official capacity;

25. NJDOC Transport Officer John Doe-15 (to be named upon Discovery) is named in his individual and official capacity;

26. NJDOC Transport Officer John Doe-18 (to be named upon Discovery) is named in his individual and official capacity;

27. NJDOC Transport Officer John Doe-19 (to be named upon Discovery) is named in his individual and official capacity;

28. NJDOC Transport Officer John Doe-21 (to be named upon Discovery) is named in his individual and official capacity;

29. NJDOC Transport Officer John Doe-22 (to be named upon Discovery) is named in his individual and official capacity;

30. NJDOC Transport Officer John Doe-27 (to be named upon Discovery) is named in his individual and official capacity;

31. NJDOC Transport Officer John/Jane Doe-28 (to be named upon Discovery) is named in his individual and official capacity;

32. NJDOC Transport Officer John/Jane Doe-29 (to be named upon Discovery) is named in his individual and official capacity;

33. Nurse John/Jane Doe-23 (to be named upon Discovery) is at all times a nurse for the UCHC is named in his individual and official capacity;

34. Richard DeFazio is a Custody Staff/supervisor is named in his individual and official capacity;

35. John/Jane Doe-43 of NJDOC Centeral Transportation Supervisor (to be named upon Discovery) is named in his individual and official capacity;

36. Ofc. Merrel is a Custody staff is named in his individual and official capacity;

37. Ofc. Witfield is a Custody staff is named in her individual and official capacity;

38. Ofc. Lewis is a Custody staff is named in her individual and official capacity;

39. Sharon R. Graham an official of NJDOC Offender Revenue Collection Unit is named in her individual and official capacity;

40. Tiffany Fairweather an administrative official of the NJDOC is named in her individual and official capacity;

41. Cindy Ford an administrative official of the NJDOC is named in her individaul and official capacity;

42. University Correctional Health Care ("UCHC") Rutgers, The State University of New Jersey, which provides health care to prisoners. Defendant UCHC has entered into a contract with NJDOC, pursuant to which UCHC is responsible for carrying out NJDOC's responsibilities to provide medical, Psychological and psychiatric services for prisoners in NJDOC facilities. Defendant UCHC has breached its contract with NJDOC and acting under color of state law, has continued NJDOC's practices of providing inadequate medical care to plaintiff.

43. Diane Baca is at all times a nurse and/or a medical patient advocate at NJSP is named in her individaual and official capacity;

44. Mobolanle Ebo is at all times a nurse for the UCHC is named in her individual and official capacity;

45. Dr. Robin Miller, MD, is at all times a Doctor for the UCHC named in her individual and official capacity;

46. Paulo Verdeflor is at all times a Nurse Practitioner for the UCHC is named in his individual and official capacity;

47. Xiangrong Zhou is at all times an employee for the UCHC is named in his/her individual and official capacity;

48. Susan Spingler is at all times a nurse and/or a nurse manager for the UCHC is named in her individual and official capacity;

49. Dr. Nwachukwu, is at all times a Doctor for the UCHC and the medical director for the NJSP is named in her individual and official capacity;

50. Jane Doe-4 is at all times a Nurse Practitioner  for the UCHC is named in her individual and official capacity;

51. Jane Doe-5 is at all times a Nurse for the UCHC is named in her individual and official capacity;

52. Jane Doe-8 is at all times a Nurse for the UCHC is named in her individual and official capacity;

53. Jane Doe-11 is at all times a Nurse for the UCHC is named in her individual and official capacity;

54. Jane Doe-16 is at all times a Nurse for the UCHC is named in her individual and official capacity;

55. Dr.Jane Doe-17 is at all times a doctor for the UCHC is named in her individual and official capacity;

56.   Jane Doe-20 is at all times a Nurse for the UCHC is named in her individual and official capacity;

57.   Jane Doe-26 is at all times a Supervisor for the UCHC is named in her individual and official capacity;

58. John/Jane Doe-31 is at all times a Nurse for the UCHC is named in his/her individual and official capacity;

59. John/Jane Doe-32 is at all times a Nurse for the UCHC is named in his/her individual and official capacity;

60. John/Jane Doe-33 is at all times a Nurse for the UCHC is named in his/her individual and official capacity;

61. John/Jane Doe-34 is at all times a Nurse for the UCHC is named is named in his/her individual and official capacity;

62. Dr. Coffman (phonetic) is at all times a Doctor for the UCHC is named in his individual and official capacity;

63. Dr. Jane Doe-37 is at all times a Doctor for the UCHC is named in her individual and official capacity;

64. Dr. John Doe-38 is at all times a dentist for the UCHC is named in his individual and official capacity;

65. Sharon Aker  is at all times an employee for the UCHC is named in her individual and official capacity;

66. Jane Doe-39 is at all times a nurse for the UCHC is named in her individual and official capacity;

67. John/Jane Doe-30 is at all times a custody supervisor for the NJDOC is named in his/her individual and official capacity;

68. John Doe-35 is at all times a custody officer for the NJDOC is named in his/her individual and official capacity;

69. John Doe-36 is at all times a custody officer for the NJDOC is named in his/her individual and official capacity;

70. Sgt. Akeisha Watters is at all times a Sergeant for the NJDOC is named in her individual and official capacity;

71. Major Craig Sears is at all times a Major for the NJDOC is named in his individual and official capacity;

72. Johathan Gramp is at all times an administrative agent for the NJDOC is named in his individual and official capacity;

73. Fathom Borg is at all times an administrative agent for the NJDOC is named in his individual and official capacity;

74. Mervin Genash is at all times an Associate Administrator for the NJSP is named in his individual and official capacity;

75. Maggie Reed is at all times a inmate patient advocate for the UCHC is named in her individual and official capacity;

76. John/Jane Doe-6 is at all times a Grievance Coordinator for NJDOC is neamed in his/her individual and official capacity;

77. Additional defendants may be named (or removed) at a later time upon further investigation, interrogatories, and discovery.

## PREVIOUS LAWSUITS

78. There are no previous dismissed federal civil actions or appeals.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

79. The plaintiff had exhausted all available administrative remedies.

## FACTUAL ALLEGATIONS
## DEFECTIVELY DESIGNED NJDOC VAN PASSENGER COMPARTMENT

80. The NJDOC  uses transportation vans, buses, and cars to transport inmates to and from Courts, hospitals, funerals and other places as needed. The new vans that NJDOC has acquired to transport inmates contains Three (3) sections or compartments. It should be noted that some new NJDOC vans have Four (4) compartments, which is in the middle of the van that is rarely utilized to transport inmates. The officers' compartment contains Two (2) seats, one for the driver and another for passenger. The officers' seats are accommodated with comfortable safety cushions and are fully equipped with shoulder and waist seat belts in accordance with Federal and State rules/laws and regulations of the National Highway Traffic Safety Administration.

81 . The NJDOC transportation van's inmate passenger (Polygon shaped) compartments (hereinafter "Compartment") are a separate structure within the van's main structure. See DiagramAat EXHIBIT A1[1]. In the new NJDOC vans' crammed compartments,  inmates are seated side ways looking inside the van rather than being seated in a forward-looking direction with a seating capacity of 4 inmates on each side.  See Diagram-A at

---

[1] The Diagram-A (annexed hereto as Exhibit A1) of the NJDOC Van is drawn based on Plaintiff's observation of the NJDOC van's compartment and  it is accommodated with this lawsuit to better assist The Court to  understand Plaintiff's complaint due to plaintiff's language barrier and his inability to articulate the language to describe the design defects, inadequate safety features, and other issues derived from it.

Exhibit A1. The compartment's first half of the side wall is designed approximately 2½$^2$ feet going up straight from the steel seat. At the end of 2½ feet juncture of the side wall from the steel seat, the remaining upper half side wall turns into an appropiate 45 degree angled shape going towards almost near the middle of the van until the angled side wall's end touches the compartment's ceiling wall.

82. Due to the design defect in an angled manner of the upper half side wall of the compartment, inmates are forced to sit in a bow position or in an abnormal posture for a prolonged transportation rendering the upper body very vulnerable to sustain serious injuries in many form, shape, and manner, especially inmates with severe medical conditions and/or with disability, when the van is in motion. See DIAGRAM-A at Exhibit A1. This vulnerability is further exacerbated due to the void of adequate safety features and other reasons (including but not limited to) as stated hereinafter.

83. Due to non-existence of a shoulder seat belt to strap on for prisoners and any proper safety cushioning or padding for the head (and the upper-body) to be kept in a secured position, inmates frequently sustains head and back injuries, whiplashes

---

$^2$ The measurement of the side wall and floor/leg space is an approximation based on plaintiff's observation of the NJDOC Van's compartment.

and violent jolting of the head and the upper-body from right to left or left to right, and from front to back or from back to front when the NJDOC vans are driven in excess of speed, when driven on ruff road conditions, when subjected to "rough ride assaults." These treacherous conditions cause inmates to sustain severe lifelong injuries in many form, shape, and manner; and

84. Due to absent of a waist seat-belt and/or when the inmates are unable to strap on the waist seat-belt, the failure to have a set belt causes inmates (1) to slid off from the steel seat on to the van floor simultaneously landing on their tailbone very hard and forcefully  hitting their head on the compartment's central divider wall, (2) to become airborne and violently bounce around up and down causing the head to hit the van's compartment ceiling wall and the angled upper side-wall with forsceful impact, and (3) to bounce up and  land back very hard on their tailbone on the steel seat  when the vans are driven  in excess of speed, when the breaks are applied  abruptly, when sharp/sudden turns are made, when driven on rought road conditions, and when subjected to "rough ride assaults." As a result, it  causes inmates to sustain severe injuries in many form, shape, and manner; and

85. Because inmates are forced to sit in an abnormal postures or in a bow position due to the defective design of the compartment's  angled upper side wall and without the protection

of a shoulder seat-belt and any safety cushions in prisioner compartments as oppose to sitting up straight, inmates experience severe strain and pain on their neck and back. To alleviate the severe strain and pain on the neck and back, inmates are forced to lean forward their upper body with the head hanging down by placing their elbows on the thighs to support the upper body weight (resembleing a fetal position);

86. Inmates forced to sit in an abnormal leaned forward position subjects them to sustain severe injuries in many form, shape, and manner to their upper body and neck resulting whiplashes and from violent jolting of the head  because the inmates' upper body is unsecured while leaned forward with the head  hanging down lose; and absent a waist seat-belt strapped on, inmates slide forward from the steel seat and hit the head hard on the compartment's central divider wall when the vans are driven  in excess of speed, when the breaks are applied abruptly, when sharp/sudden turns are made, when driven on ruff road conditions, and when subjected to "rough ride assaults."

87. The van's crammed prisoner's compartments are not equipped with shoulder seat belt[3] and safety head cushion or padding. The void of shoulder seat-belts causes inmates to forcefully move forward and back causing the upper body and the head to hit very hard on the compartment's defected angled upper side (steel) wall  when the vans are driven  in excess of speed,

when the breaks are applied abruptly, when sharp/sudden turns are made, when driven on rough road conditions, and when subjected to "rough ride assaults." As a result, inmates sustain severe injuries to head, neck, and back in many form, shape, and manner.

88. The vans' compartment not equipped with adequate safety head and seat cushion or any padding further compromises inmates' safety. The absence of safety head cushion or proper padding causes inmates' head and upper body from not being kept in a secured position to prevent the head from violently move from side to side or forward and backward motion, and to prevent back of the head from hitting hard on the angled upper side steel wall when the head violently moves forward and backward. In addition, failure to install/accommodate seat cushion on the steel seat causes inmates to land very hard on the steel seat directly on their tailbone resulting from inmates going airborne and/or bounce up and down when the vans are driven in excess of speed, when the breaks are applied abruptly, when sharp/sudden turns are made, when driven on ruff road conditions, and when subjected to "rough ride assaults," which results in many form, shape, and manner of head, back, and neck injury.

---

3 To this date, NJDOC vans are not equipped with shoulder seat belt and head/side upper-body safety padding or cushion.

89. The van compartment's waist seat belt[3] are installed in a manner preventing inmates from reach and strap on the waist seat belt by themselves, as they are handcuffed to  the belly-chain then tightly chained to their waist. As a result, when inmates seeks assistance from transportation Officers, too often, officers are annoyed and reject inmates' requested assistance to strap on the waist seat belt. Officers do not want to enter the van compartment to assist inmates to strap

on waist seat belt because  of (including but not limited to) the unsanitary conditions and the crammed space caused by the central divider wall, which makes officers uncomfortable and annoyed, as the crammed compartment space hinders an officer's ability to strap on the waist seat belt in a comfortable and safe manner.

90. When inmates persist an officer to strap on the waist seat-belt, after the request had been denied, inmates are subjected to retaliation (including but  not limited to) by subjecting them to "rough ride assaults" and by not affording them  a chance to use bathroom during the prolonged transportation. Therefore, for fear of retaliation, too often, inmates are deterred from requesting with an officer to assist them with strapping on the waist seat-belt.

---

[3] There are rare instances, inmates maybe able to reach the waist seat blets to strap on by themselves if the belly chain/shackle is lose or the waist seat belt is sticking up within a reaching distance.

91. Compartment's safety hand strap for inmates to grab is installed approximately 3 to 5 inches below the compartment's steel seat on its front side wall. See DIAGRAM-A at Exhibit A1. Because inmates' hands are handcuffed and belly chained to their waist, they are unable to reach the safety hand strap for them to grab, as the distance from the handcuffed hands to the safety hand strap is great. As a result, inmates are precluded from grabbing the only hand strap available in the compartment for safety when the NJDOC vans are driven in excess of speed, when the breaks are applied abruptly, when sharp/sudden turns are made, when driven on ruff road conditions, and when subjected to "rough ride assaults," which causes inmates to suffer severe injuries in many form, shape, and manner.

92. The NJDOC van compartment's crammed design and inmates sitting packed in tight side ways looking inside the van precludes them of outside view, which causes (including but not limited to) severe claustrophobia, Nausea, difficulty in breathing, and headache. The main rear door's window view is blocked by the compartment's rear door window's dotted holes. Outside view through front windows of the compartment are blocked by the officers with a paper and/or by tinted windows. In addition, inmates' head bouncing off the compartment's angled upper side wall, as the van turns and swerves, cause inmates to

16

become very sick, experiencing headache, and nauseat resulting in vomiting; and

93. When inmates with physical injury/disability, and severely sick are transported in the compartment to and from hospitals (and court trips) before or after various form of medical treatments, their safety is compromised for reasons stated in paragraphs 81 to 92, especially due to no proper air ventilation. In particular, when inmates are forced to travel in the compartment after a medical procedure and/or while still sedated, too often, they sustain severe injuries and causing their existing injuries to exacerbate due to reasons stated in paragraphs 81 through 92. Furthermore, an inmate with fresh wound from a medical procedure bleeds blood and other bodily fluid on the compartment floor and wall as the inmates is subjected to one or more conditions as described on paragraphs 81 through 92. Therefore, causing crammed inmates in the compartment to travel under unsanitary conditions for prolonged period and exposing them to communicable diseases.

## UNLAWFUL VAN TRANSPORTATIONS & DENIAL OF PROPER MEDICAL TREATMENT FOR SEVERE NERVE INJURY/PAIN

94. On November/December of 2014, plaintiff for the first time was transported to and from the Court in the NJDOC van's compartment. During these Court trips, plaintiff was transpotated

in compartments that did not have any shoulder/waist seat belts, safety cushions/paddings, and in a defective and flawly designed passenger compartment for prolonged hours;

95. Plaintiff requested the officer John Doe-1 to transport him in a van with proper seat-belts to be secured, but he was advised "you will be all right." During reckless driving and rough ride assaults, it had caused plaintiff to airborne and was bounced around like a lose cargo causing his head to hit the angled  upper side wall and the roof of the vans very hard; and at times,  he  landed on his tail-bone forcefully when bounced up and down  and when he slid of the slippery steel seats. Plaintiff's entire body was abnormally and violently jolted causing whiplashes;

96. Numerous time plaintiff had voceferously requested to the transport officers  "CO, take it easy on the road and easy on the break and turns." Plaintiff did not get any positive response from the officers. Also the van ride became violently more turbulent. When the plaintiff made repeated cry to stop causing him to bounce around, one of the officer said, "Shut the fuckup;"

97. After each NJDOC van rides to and from the Court, plaintiff had reported the pain that he was experiencing on his back and neck to the New Jersey State Prison ("NJSP") nurse Jane Doe-5 (and to the Passaic County Jail ("PCJ") Nurse);

98. Upon conveying to the NJSP nurse of plaintiff's painful experiences in the NJDOC vans, the  nurse had advised him, "Everybody is complaining about the new vans ... it's [the pain] nothing ... it will go away in few days ... you're not used to travel like this ...." On this day, no medical examination was conducted or prescribed any medication/treatments. Plaintiff's pain on his back and neck, and the body sore he was experiencing went away within Two weeks;

99. On December 10, 2014 plaintif filed an inquiry and he also filed a grievance on December 27, 2014 in a timely manner addressing the uncontitutional conditions of the NJDOC Vans, but to no avail.

100. On October 10, 2016, plaintiff submitted an electronic request with the NJDOC custody to transport him to and from the Court for the up-coming court hearing in a van with adequate safety features, and  without subjecting him to reckless driving and rough ride assaults. Moreover, to permit plaintiff to use a bathroom without a prolonged van trip of  Four to Six hours while having to sit in an abnormal posture;

101. On October 20, 2016, after plaintiff was placed  under handcuff to belly and leg-shackled, he was placed in a similar NJDOC van's compartment as describe in Paragraphs 81 through 93. When plaintiff expressed his concern for his safety to the transport officer John Doe-7 and requested to be transported in a

safe NJDOC van, he was advised, "all vans are like this ... if you don't like the van ... you could refuse to go." Plaintiff did not want to miss his Court hearing and was left with no choice but to travel in the unlawful compartment.

102. Having no seat-belts on for the next Five hours straight in the compartment, plaintiff was subjected to countless bouncing around, hitting his head on the angled upper side wall and the roof of the compartment, landing hard on his tail-bone, and suffering whiplashes as a result of reckless driving and rough ride assaults. Numerous time plaintiff yelled out to the transport officer to drive slower, "CO, take it easy on the break and turns," but the reckless driving and applying the van break abruptly had increased, insofar, plaintiff was solely denied to use a bathroom by Officer Becker because of his repeated complaint while other inmates were permitted to use the bathroom;

103. Upon returing to NJSP to and from the Court trips, plaintiff made  complaint to the nurse Jane Doe-8 he is experiencing headache and body pain, especially on back and neck, from landing on his tail bone, hitting his head on the roof and the angled upper side wall of the compartment and from whiplashes. The nurse dismissed plaintiff's  medical visit quickly by stating, "There is noting I could do for you ... it [the pain] will go away soon."

104. On October 26, 2016, plaintiff had filed another grievance addressing the unconstitutional  conditions of the NJDOC vans that subjected him to painful discomforts/injuries during transportation, and denial of access to bathroom in retaliation by Ofc. E. Becker and his partner, but to no avail.

105. On October 19, 2017, plaintiff was againg placed in an unsafe NJDOC van's compartment after  handcuffed to his belly and leg-shackled. As the plaintiff enterend the compartment, he noticed  waist seat belts (but no shoulder seat belt) has been installed. Since plaintiff could not reach the seat belt to secure himself, he requested the officer to assist him  to put the seat belt on. Officer had directed plaintiff to  sit by the door. Thereafter, officer strapped on the waist seat belt for plaintff[4].

106. Once the NJDOC van were in  motion, plaintiff repeatedly began to experience abnormal movement of his upper body going forward and backward (and from left to right) hitting his head on the compartment's angled upper side wall very hard.

107. Upon arrival at PCJ, plaintiff complaint and requested treatment to the intake nurse that  he was experiencing sharp

---

[4] Initially, when the new NJDOC Vans was introduced on 2014 for inmate/plaintiff transportation, there were no safety features for inmates/plaintiff to utilize, though waist seat-belt and hand strap to grab were installed in some vans maybe after year 2016.

pain on his back and neck from the injuries suffered in the NJDOC van. The PCJ nurse advised plaintiff that "I can't do nothing for you...you're a state prisoner...talk to the medical when you get back to the prison." Plaintiff's entire body was experiencing soreness, especialy sharp pain on his back and neck while his stay at PCJ.

108. On October 23, 2017, while NJDOC Officer John Doe-9 was handcuffing and leg-shackling the plaintiff, he conveyed to the officer Doe-9 the pain on his back and neck resulting from the van injuries on October 19, 2017. In response Officer Doe-9 said, "You're not even in the van and you're fuckin complaining already...turn around and face the fucking wall." Plaintiff was placed in an unsafe compartment without the seat belt on, though he requested officer's assistance to put the seat belt on as plaintiff was unable to secure himself. Officer Doe-9 said to plaintiff, "You don't need it ... just hold the fuckin safety hand strap ... stop fuckin complaining," which plaintiff cannot reach, i.e., the hand strap. See Diagram-A at Exhibit-A1.

109. Just several minutes (or more) after the DOC van was in motion, a sharp turn caused plaintiff to slipped off the steal seat simultaneously landing hard on his tail-bone and hitting his head on the centeral divider wall resulting in severe pain. As the reckless driving continued, plaintiff suffered whiplashes and kept hitting his head on the angled

upper side wall and on the cceiling of the compartment as he bounced up and down, and moved forward and backward. Several times, Two (2)  inmates and plaintiff yelled out to  officer John Doe-10 to drive more carefully, but to no avail, except the driving became more reckless and the officers retaliated in the form of "rough ride assault."

110. The officer Doe-10 kept driving the van without any regards for plaintiff's safety. When plaintiff (and other inmates) repeatedly yelled out to drive safely, the officer said, "if you keep fuckin complaining ... it aint going to get any better." At this point, plaintiff (and other inmates) remained quite for fear of further rough ride assaults, though the reckless driving  continued  for the remainder of the trip, as a result, plaintiff kept  sustaining physical injury. As described in paragraph 108 through 110.

111.  After arriving NJSP on October 23, 2017, plaintiff reported to the Nurse Jane Doe-11 that he was bounced around both ways to and from the court in the NJDOC van "hit my head hard on the van's wall/landed on my tail bone very hard/my body got jolted violently/I'm feeling sharp nial stabbing like pain on my neck & back." The Nurse Doe-11 advised to plaintiff, "Your discomforts are normal/it will go away in a week or Two/all inmates [are] complain[ing] the same issues/nothing to worry about." Plaintiff was quickly dismissed from the clinic without

conducting any form of medical examination  for his back and neck pain by stating, "You will be scheduled for a follow-up with a provider," but plaintiff was never called to the prison medical for a follow-up visit.

112. On November 02, 2017, plaintiff consulted with Dr. Nayik (Psychiatrist) that he was experiencing unusual amount of pain on his neck and back since bouncing around in the NJDOC vans. Therefore, plaintiff was having trouble sitting for long time, as he was experiencing nail stabbing pain and burning sensation on his back and neck rendering him unable to perform his legal work (and other activites), which was severly stressing him. Dr. Nayik  advised plaintiff that "stress is causing you pain and headaches...I can't do nothing for you...don't stress." Doctor further said, "strain from [prison] work" is causing you back and neck pain.

113. On December 7, 2017, plaintiff again conveyed to the Mental Health ("MH") professional  that he is under a lot of stress and depression, as his back and neck continues to be in pain. MH professional said to plaintiff, "your stress is causing you pain...maybe your [prison] work is putting a lot of strain on your back and neck, as you pushing people around the jail." In confusion, plaintiff tried to tell the MH professional "I got injured in the NJDOC van." But the MH professional persisted, "No, it is stress and putting strain on your back from work"

causing you pain; therefore, "work safely." When plaintiff further requeste for Mental Health department's assistance to receive proper medical treatment for his sever nerve pain, he was advised by the MH professionals "we do not interfere with your medical treatments ... you need to address it with medical Dept."

114. On February 28, 2018, plaintiff submitted a Medical Form MR-007 requesting follow-up medical treatments for his severe headaches, back and neck nerve pain. On March 02, 2018, plaintiff consulted with Nurse Scott that plaintiff was experiencing "sharp nail stabbing and burning" like pain on his neck extending all the way to his lower back. Plaintiff further conveyed to nurse that he was experiencing on and off radiating pain into his left arm with constant headaches. On this day, plaintiff was advised by the nurse not to do things that puts strain on his back and was medically laid in for Two days from palintiff's prison job. Plaintiff was advised that he "will be scheduled to see a provider" soon and was dismissed.

115. On March 03, 2018, plaintiff consulted with Nurse Practitioner ("NP.") Verdeflor explanining to him the persistent back and neck nerve pain that plaintiff was experiencing since the last NJDOC van ride on October 23, 2017. Plaintiff conveyed to NP. Verdeflor how he was bounced around in the NJDOC van's passenger compartment causing his head to hit the wall and the ceiling several times and how he landed on his tail-bone very

hard numerous times, and sustained whiplashes. Plaintiff further conveyed that he was experiencing "sharp nail stabbing and burning" like pain on his neck extending all the way to his lower back; and that plaintiff was experiencing on and off radiating pain into his left (and right) arm with constant headache.

116. Plaintiff further conveyed to NP. Verdeflor that he was having trouble sitting for more than Ten (10) Minutes to do legal work (and other activities, e.g., difficulty working, trouble sleeping at night) as he was feeling burning like  sensation and nail stabbing like pain on his back and neck; and that plaintiff waked-up with stiff neck and  was further affecting  his ability to sleep at night due to sharp pain and numbness. Therefore, plaintiff requested to accommodate a back-brace and a neck collar/brace to alleviate strain and pain on his back and neck while engaged in one or more major activities as noted above, but it was denied per NJDOC policy and advised plaintiff to get a back/neck brace through his work supervisor.

117. On this date, NP. Verdeflor merely conducted a cursory examination on plaintiff by asking few questions and prescribed him Naproxen for stiff neck and back by advising  "you have early stage arthritis ... this is causing you pain and stiffness," without specifically referring to any injuries. When plaintiff questioned his diagnosis by asking "are  you sure that I'm not feeling the pain because  of what  I had suffered in the NJDOC

vans?," NP. Verdeflor angrily said, "I'm ordering X-Ray of your Cervical Spine and Lumbar Spine," and advised plaintiff to practice "Gentle and gradual stretch and strengthening ... try not to put strain on your back." When plaintiff requested how to safely perform gentle and gradual stretch without putting strain on his back and neck, NP. Verdeflor ordered plaintiff to "get out of my office."

118. On March 08, 2018, X-Rays of plaintiff's Cervical Spine and Lumbar Spine were taken at the NJSP Medical Department.

119. On March 19, 2018, plaintiff submitted an electronic inquiry requesting results of X-Rays taken on March 08, 2018 and for proper treatments for his persistent neck and back pain since he was never called back to the prison clinic for follow-up treatments and/or to discuss the X-Ray results.

120. On March 26, 2018, Nurse Diane Bacca responded to plaintiff's electronic inquiry requesting for adequate medical treatments by stating that "Your xrays result were normal."

121. On March 31, 2018, plaintiff filed a grievance as he had continued to experience back and neck nerve pain, though Naprosyn minimally help reduced the pain and stiffness of his joints (but not nerve pain), addressing numerous issues in addition to NP. Verdeflor's inadequate medical treatment of his painful symptoms.

122. On April 02, 2018, Plaintiff was seen by a NP. Jane Doe-4 . Plaintiff explained in detail to the NP. Doe-4 his injurious experiences in the NJDOC vans and the painful symptoms as stated in paragraphs 115 through 116. NP. Doe-4 advised plaintiff that "your pain is due to arthritis and not from any alleged injuries in the NJDOC vans as the X-Rays reveals no injury." Therefore, "keep doing gentle and gradual stretch and strengthening." When plaintiff asked how to do these gentle stretches, NP. Doe-4 printed copies of neck/back and shoulder exercises and gave it to him. Since plaintiff's supervisor advised him to request a neck/back brace from the medical, he again requested for it to reduce strain on his back and neck, but it was denied "per DOC policy." NP. Doe-4 dismissed plaintiff by stating "there is nothing else I could do for you ... submit a sick call slip for a follow up."

123. On June 25, 2018 for a prolonged Court trip, plaintiff was handcuffed and leg-shackled then placed in a NJDOC van's passenger compartment unsecured by Officer John Doe-12. Through out the trip, as the NJDOC van swerved in and out of traffic, sudden breaking and turning  caused plaintiff  to bounce up and down causing his head to hit the ceiling and the compartment's angled upper side wall very hard. At times, plaintiff slid off the steal seat as he had no waist seat belt strapped on causing him to land hard on his tailbone on the van's floor. For fear of

retaliation in the form of rough ride assaults, plaintiff remained silent  throughout the trip. Upon arrival at  the Passaic County Jail ("PCJ"), plaintiff reported to the medical staff the pain on his neck/back and the headache he was experiencing from the NJDOC van ride, but to no avail.

124. On June 29, 2018, plaintiff was placed in the NJDOC van's compartment unsecured by Officer John Doe-13 after handcuffed and leg shackled to be transported back to the prison from PCJ. Immediately after the NJDOC van had taken off, plaintiff's head had started to bounce back and forward hitting the angled upper side wall from sharp turns and reckless driving. As the NJDOC van continued to travel in excess of speed and swerving in and out of traffic, plaintiff continued to bounced around and sliding off the steel seat causing his head to hit the ceiling/side wall and landing very hard on his tail bone.

125. Approximately traveling after an hour and half, the NJDOC van had stopped and transferred plaintiff to another NJDOC van[5]. Plaintiff was in severe back and neck pain and experiencing headache from hitting his head on the compartment's wall and

---

[5] Please take note that plaintiff sometimes was transported from New Jersey State Prison to Bordon Town State Prison (and to other locations) to be transferred to another NJDOC van to continue the Court trip. However, the unlawful NJDOC van ride continued no matter how times plaintiff were transferred to another NJDOC van. Upon discovery, plaintiff will amend the complaint with accurate facts concerning NJDOC van transfers.

sliding off the steal seat, he had asked the Officer  John Doe-14
to assist him to strap on the waist seat belt to avoid further
injury, but to no avail. For fear of retaliation, plaintiff did
not insist the officers to assist him strap on the waist seat
belt. As Officer Doe-14 began to drive recklessly, plaintiff
began to experience abnormal movement of his upper body violently
jolting his head back and forth causing his head to hit the
angled upper side wall over and over again. Several times,
plaintiff slid off the steel seat landing on his tail bone and
hitting his head on the compartment's central divider wall when
the break was applied suddenly and when the van made sharp turns.

126 . After making numerous stops on a prolonged journey,
upon arrival at the New Jersey State Prison ("NJSP"), officials
at NJSP's intake refused to take  back Plaintiff inside the
prison as there was some kind of an emergency. The impatient
transportation officer Doe-14, after waiting for about 35-
minutes, took off from the NJSP's intake by speeding away causing
plaintiff to slide forward and backward then sliding off the
steel seat. Plaintiff not only landed very hard on his tail bone,
but also, bounced up and down very high from the van's floor
hitting his head very hard on the compartment's walls as the
officer did not slow down for the speed bumps. At this point

plaintiff screamed "please don't kill me ... take it easy on the gas pedal."

127. Suddenly, the van came to a complete stop. Officer Doe-14 opened the compartment door and yelled at the plaintiff "you got a fuckin problem?" Out of fear, plaintiff remained quit. Thereafter, plaintiff was ordered to "get the fuck out of the van" and he was placed in another NJDOC van for the Third time.

128. After plaintiff entered the Third unsanitary NJDOC van, which did not have waist seat belt or  safety hand strap and reeked of human waste, he was transported  to St. Francis Hospital. On the way to the Hospital, Officer John Doe-15's reckless driving further caused plaintiff to  bounce up and down causing his head to repeatedly   hit the upper angled side wall and the ceiling.

129. From St. Francis Hospital, plaintiff (and other inmates) was transported back to NJSP in a handicapped NJDOC vehicle. Upon arrival at NJSP, plaintiff was taken to NJSP Medical  Dept./clinic to report any potential injuries that he may have sustained. At the clinic, instead of consulting inmates privately, Nurse  Mobolanle Ebo came out to the waiting area and started to ask standard questions to all inmates (including plaintiff) did your suffer any injuries or "do you want to hurt yourself or others,...." Plaintiff requested with Nurse Ebo to consult with her in private as he was feel pain on his back and

neck from the injuries he suffered from bouncing around  as he was sitting in a abnormal position unsecured.

130. Nurse Ebo denied plaintiff's request for treatment by stating "put a slip in" and she walked away. At this point plaintiff requested to speak with Nurse Ebo's supervisor. Instead of calling the supervisor, Nurse Ebo signaled via eye contact to Officer Lewis to have plaintiff removed from the clinic. At this point, Officer Lewis interposed and instructed  plaintiff to leave the clinic. When plaintiff pleaded with Officer Lewis to permit him to see a supervisor as he was in  lots of pain, Officer Lewis said, "if you don't fuckin leave now ... I gona lock you up." For fear of going to lock-up and to avoid potentially many other forms of foreseeable retaliation, plaintiff left the clinic in pain without having an opportunity to treat his pain and issues.

131. On July 4 or 5, 2018, plaintiff submitted a medical form to be seen by a doctor to address his severe allergy and his neck/back pain issues derived from the NJDOC van injuries.

132. On July 06, 2018, plaintiff went to clinic. As plaintiff tried to address his neck/back pain issues to the Nurse Jane Doe-16, he was quickly advised, "You're here to treat allergies not for back or neck, put a slip in." Nonetheless, plaintiff briefly stated his pain on his back/neck and he was advised by Doe-16, I will dismiss you if you keep talking. For

fear of retaliation, plaintiff hopelessly and helplessly remained silent for the remainder of his consultation.

133. For several more days, plaintiff continued to experience severe mental distress, headache, trouble sleeping at night, and severe (nerve) pain on his neck/back area while hoping the pain would go away as did in the past. As the painful conditions persisted, plaintiff submitted an electronic Inquiry/Grievance on July 10, 2018 addressing his pain and the denial of adequate medical treatment by Nurse Ebo.

134. On July 11, 2018 Nurse Diane Bacca responded, "You will be scheduled to be seen for your complaints of pain. Your comments regarding the staff behavior have been given to the Nursing Management for investigation and any action deemed necessary. We apologize that you were not given the proper attention and privacy that you deserve."

135. On July 12, 2018, plaintiff consulted with Nurse Vetereni (phonetic) about his back/neck pain and the injuries plaintiff suffered in the NJDOC vans as described in paragraphs 123 through 128. Nurse advised plaintiff that he will be scheduled to see a provider within Seven (7) days to discuss his injury and nerve pain.

136. On July 27, 2018, plaintiff was seen by Dr. Jane Doe-17. Plaintiff addressed to Dr. Doe-17 in detail the mental distress and pain he was experiencing in many form, shape and

manner, especially how the plaintiff's head had repeatedly hit the van's side wall and the ceiling. In particular, the sharp nail stabbing like pain on his back area and the sharp shooting pain into his left/right harm, insofar, plaintiff was unable to sit for longer than 10 minutes and trouble sleeping at night. Without conducting any examination, Dr. Doe-17 advised plaintiff that she is ordering an X-Ray. Once the X-ray results are in, "I will call you in for a follow up to discuss your pain."

137. On August 02, 2018, X-Rays of plaintiff's Thoracic Spine AP and LAT were taken.

138. On August 05, 2018, plaintiff submitted an electronic Inquiry/Grievance requesting that he be transported to and from Court in a safe NJDOC van with adequate safety features and without subjecting him to ride in a designed defective NJDOC van's passenger compartment for over 2 to 4 hours.

139. On August 06, 2018, 8 plaintiff was handcuffed by Officer John Doe-18 to his belly and leg-shackled, then placed in the NJDOC van's passenger compartment unsecured for a Court trip. Throughout the prolonged trip, plaintiff bounced around, repeatedly causing his head to bouncing back and forth off the angled upper side wall and the ceiling as the van swerved in and out of traffic when applied sudden breaking and recklessly driving. Plaintiff complaint to the PCJ nurse the pain he was

experiencing on his back/neck and the headache he was experiencing from the van ride, but to no avail.

140. On August 08, 2018, Officer John Doe-19 placed plaintiff in the van's compartment unsecured after he was handcuffed to his belly and leg-shackled to return to NJSP. During this trip, plaintiff was very tired and was already in pain from the unlawful van ride on August 06, 2018. Plaintiff was again subjected to similar painful experiences as described in paragraph 139. At one point, plaintiff slid off the steel seat, bouncing back up so high hitting his head on the ceiling very hard as the Officer Doe-19 had suddenly applied the break. Upon arrival at the NJSP, plaintiff told Nurse Jane Doe-20 that he was bounced around in the van and his head had repeatedly hit the wall of the van and sustained whiplashes. As a result, "I'm feeling pain on my neck/back area" and was having bad headache. Nurse Doe-20 advised plaintiff that he "will be scheduled for a follow-up," but he was never called back for a follow-up.

141. On August 21, 2018, Nurse Diane Bacca electronically sent a message to plaintiff that "Your latest xray results were normal," which was take on August 02, 2018.

142. On August 22, 2018, plaintiff was directed to go to NJSP intake to be transported to Court. As Officer John Doe-21 handcuffed and leg-shackled plaintiff, he requested with Officer Doe-21 that plaintiff be transported in a safe NJDOC van. Officer

Doe-21 had advised plaintiff that "all van's are the same ... if you don't like it, you could refuse to go." Plaintiff not wanting to miss his Court date decided to go. After plaintiff entered the NJDOC van's passenger compartment, Officer Doe-21 did not assist him to strap on the waist seat belt upon his request. Plaintiff did not proceed with further requests for assistance to strap on seat belt, as he feared retaliation in the form of "rough ride assaults." During the van ride, plaintiff was subjected to unlawful conditions as stated in Paragraphs 139 through 140. Upon arrival at PCJ, plaintiff requested the nurse for medical treatment for back/neck pain and headache, but to no avail.

143. Few days later, plaintiff was transported back to NJSP in the same inhumane manner as stated in the paragraph 142 by Officer John Doe-22. Upon arrival at NJSP, plaintiff pleaded with Nurse John/Jane Doe-23 that he be treated for his neck/back pain from the unlawful van ride as described in paragraphs 139 through 140. Nurse Doe-23 had advised plaintiff that she can do nothing for him but she "will schedule you for a follow-up," but plaintiff was never called for a follow-up nor was he seen by a doctor for his pain on back/neck.

144. On August 30, 2018, plaintiff filed a Inquiry/Grievance addressing his mental distress over not receiving adequate medical treatment for his neck/back nerve pain and for the

repeated Five dollars co-pays for each visit charged to his
account in retaliation. On September 02, 2018 Xiangrong Zhou
responded, "You need [to] see nurse for your pain, so this
request will be treated as MR007/ sick call slip."

145. On September 04, 2018, upon plaintiff's arrival to the
NJSP clinic, Ofc. Witfield advised him that "your nurse call is
canceled" and  "you need to leave." When plaintiff inquired  with
Ofc. Whitfield as to what reason my medical pass was canceled,
officer said, "I don't know." Plaintiff pleaded with Officer
Witfield to permit him to speak with a medical supervisor to
receive treatment for his neck/back pain (and for allergy
symptoms). At this point, Ofc. Witfield denied plaintiff's
request and threaten him to send plaintiff "to lock up if you
don't leave the clinic now." For fear of retaliation, plaintiff
left the clinic without receiving no medical attention.  Thus, he
filed an Inquiry/Grievance after returning to his Unit.

146. On September 06, 2018, Xiangrong Zhou responded to
plaintiff's Inquiry/Grievance, "According to EMR [Electronic
Medical Record], you talked to the nurse [on september 04, 2018],
and states no medical needs on that day. Please file MR007 form
if you (sic) medical concerns and need to be seen by the health
care provider."

147. On September 06, 2018, plaintiff filed another
electronic Inquiry/Grievance opposing Ms. Zhou's false claim that

the plaintiff had consulted with a nurse for his painful ailments on September 04, 2018. To support his claim, plaintiff had directed the medical to review "the surveillance camera in the medical." It will reveal that plaintiff was not afforded to any consultation whatsoever  with no medical professionals as Ofc. Witfield had threaten to lock him up. On September 08, 2018, Ms. Zhou responded, "Please file MR007 form to request to see provider."

148. On September 09, 2018, plaintiff submitted Medical treatment Request Form MR-007. On September 11, 2018, during plaintiff's consultation with Nurse Jane Doe-25, he had attempted to address his back and neck pain resulting from the unlawful NJDOC van rides to and from the Court trips. Nurse Doe-25 advised plaintiff, "My supervisor [Jane Doe-26] advised me that you are not here for back and neck pain treatment ... you are here to treament you allergies." When plaintiff inquired as to why he were never scheduled to receive a follow-up treatment for his back and neck pain issues, as advised on August 8 and 24, 2018, Nurse Doe-25 said, "I don't know. Put a slip in," and directed plaintiff to leave the clinic. On this day, plaintiff left the clinic without receiving any treatment for his neck and back pain issues.

149. On September 13, 2018, plaintiff was handcuffed  and leg-shackled, then placed in the NJDOC van's passenger

compartment unsecured by Officer John Doe-27, even though plaintiff had requested to secure him for the Court trip. During the lengthy trip, plaintiff became very disoriented and nauseated from poor air circulation and from a strong smell of urine and/or from a combination of unsanitary condition. At one point as the van swerved, plaintiff slid forward causing his head to hit very hard on the compartment's central divider wall and landed on the vans floor. Plaintiff had to crawled back on the traction less steel seat with the assistance of another inmate passenger.

150. As the van kept traveling in excess of speed and sudden breaking, plaintiff's upper-body violently jolted and caused his head to hit hard and bounce off the angled upper side wall repeatedly. At least on Three (3) occasion, when the NJDOC van traveled on  ruff road and didnot slow down for speed bump, plaintiff bounced-up and hit the compartment's ceiling wall very hard and landed back on his tail bone. On one instance as the van caused all inmates to become airborne and bounce around, a fellow inmate passenger, screamed to Officer John/Jane Doe-28, "CO stop driving crazy." To prevent retaliation in the form of "rough ride assaults," plaintiff immediately advised the fellow inmate to stop saying things to Officers that "If you tell them anything, they [Officers] will keep doing it more." After arriving at PCJ, plaintiff advised the PCJ nurse that he was experiencing headache and pain on his back/neck, but to no  avail.

151. On September 18, 2018, plaintiff was handcuffed and leg-shackled, then placed in the NJDOC van unsecured by Officer John/Jane Doe-29 for returning to NJSP. However, plaintiff was able to strap-on the waist seat belt after numerous  attempt as it was barley sticking up within  his limited reach. During the trip, plaintiff's head kept hitting the angled upper side wall and bounced forward; and violently caused his upper body and his head to move forward and backward, and side to side as the van traveled recklessly swerving in and out of traffic. Throughout the van ride, plaintiff  experienced excruciating pain on his back/neck.

152. Upon arrival at NJSP, plaintiff consulted with Nurse Vetirine (phonetic) that he was in a lot of indescribable nerve pain on his back and neck. Plaintiff told the nurse in detail how he was bounced around  countless time causing his head to hit the compartment's wall (and the ceiling) very hard during his trip to the Court. Plaintiff further told the nurse that his upper body, especially his head, was violently moving forward and backward hitting the compartment's angled upper side wall very hard going to and from the Court, and at times, plaintiff had sustained whiplashes from sudden movement of the upper-body/head. The nurse dismissed plaintiff's complain by  advising that "you will be scheduled to see a provider."

153. On September 21, 2018, plaintiff consulted to Dr. Coffman (phonetic) the allergy issues and the severe (nerve) pain he was experiencing on his back/neck after the unlawful transportation in the NJDOC vans. Upon Doctor's inquiry as to the painful symptoms, plaintiff had advised him (including but not limited to) that he was feeling sharp pain shooting into his left harm and nail stabbing like pain extending all the way to his lower back. In addition, plaintiff was having trouble sitting up for more than Ten (10) minutes and that he was feeling burning and nail stabbing like pain on his back. Plaintiff also experienced numbness on left side while sleeping at night.

154. Dr. Coffman conducted a quick examination and advised plaintiff that "according to your chart, you have early stage arthritis ... keep taking Naproxin." Plaintiff persisted to the doctor that he started to experience these  sharp pain  on his back/neck after from bouncing around repeatedly hitting his head on the NJDOC van's passenger compartment wall and ceiling, especially after the recent van rides. At this point, doctor replied "I will recommend to have you examined by a neurologist and to conduct an MRI or CT scan since nothing was reveled on your xrays of the back and neck ... I don't know if they are going to approve you." Doctor further advised  plaintiff that after a "thorough examination will discuss further treatment" and dismissed him.

## PHYSICAL THERAPY

155. On October 12, 2018, plaintiff was scheduled for a medical pass not aware of its purpose. Upon arrival to clinic, plaintiff found out for the first time that he was there to receive physical therapy. Plaintiff inquired with Nidhi Chamoli, MPT, (therapist) why he was there "to do physical therapy" when in fact Dr. Coffman was going to order further examination before administering any further treatment for plaintiff's back and neck pain? Therapist Chamoli replied, "I don't know all that but you could file a grievance ... I'm just doing my job ... this is what Dr. Coffman prescribed you." Therapist further said that "physical therapy will help slow the progression of you're arthritis and the stiffness your experiencing." Plaintiff was dismissed without conducting any physical therapy.

156. On October 19, 2018, plaintiff received physical therapy for "pain in left side of the neck, scapular region and lower thoracic spine." Plaintiff received TENS therapy and conducted some stretching exercises, yet continued to complained of severe nerve pain.

157. On October 23, 2018, plaintiff received physical therapy for pain on back and neck area by conducting stretching exercises and by receiving TENS therapy. By end of therapy session, plaintiff continued to experience severe pain on his back and neck.

158. On October 24, 2018, plaintiff submitted an Inquiry/Grievance requesting as to the status of Dr. Coffman's recommendation to have plaintiff seen by a neurologist and to receive a MRI/CT scan on his back and neck, but to no avail. However, on October 25, 2018 Xiangrong Zhou responded that "This is a request for medical care and therefore will be treated as a MR007/sick call slip."

159. On October 26, 2018, plaintiff received physical therapy for his back and neck pain, though "Feeling more flexible with exercises but pain is still same."

160. On October 30, 2018, plaintiff received physical therapy for his back and neck pain with "no new complains," but still feels the same pain as previously had stated to the physical therapist.

161. On November 01, 2018, plaintiff submitted a sick call Form MR-007 to renew his prescription Naproxin and proper medical treatments as his stiffness and nerve pain on back and neck had severely increased.

162. On November 02, 2018, plaintiff submitted an electronic Inquiry/grievance with the Mental Health Department out of helplessness and frustration hoping/requesting that they will advocate to medical department. As to this day  no one in the medical Department, seems to believe that plaintiff's severe nerve pain on his back and neck are real. This due to medical

professionals' inaction to conduct proper examination and treatment for his nerve pain.

163. On November 02, 2018, plaintiff complaint to the therapist "that he is having increased burning/shooting/lightening pain in left side of neck extending up to  left shoulder and mid thiracic (sic) region. Pain increases with turning head to rt. side." On this date, plaintiff "requested to defer exercises due to pain..." and received only TENS  therapy. After the therapy session, plaintiff had requested with the therapist that if he could see a doctor to get adequate treatment for his increased nerve pain, as he had submitted a sick call form on November 01, 2018, but his request was denied by the therapist 's supervisor Nurse Susan Spingler.

164. On November 03, 2018, when plaintiff arrived to the clinic on a Nurse call, Officer Witfield canceled plaintiff's request for medical treatment. When plaintiff inquired with the Officer "who canceled my pass?," Officer Witfield first responded "They did," but when plaintif insisted for a name an annoyed Officer Witfield said, "Nurse Veterini" (phonetic). Plaintiff pleaded with Officer Witfield to permit him to speak with the nurse as he was in a lot of pain, but she denied his request. When plaintiff requested to speak with Officer Witfield's supervisor, he was  ordered to leave the clinic or "you want to go to lock-up?" For fear of further retaliation, plaintiff left

the clinic without receiving any medical treatment for his back and neck nerve pain. Plaintiff then filed a grievance on November 04, 2018.

165. Plaintiff received a response from Major Craig Sears directing him that "You have no right to question an officer's orders. The officer informed you that your medical pass was cancelled, that is the end of the conversation. You should have just gone back to your unit ... not question the officer."

166. On November 06, 2018, plaintiff complaint to the therapist that he still feels sharp and nail-stabbing like pain on his back and neck. Plaintiff received TENS therapy on neck and thoracic region where the sharp pain is felt. Therapist further advised plaintiff that if you become very anxious it may increase your pain; therefore, instructed plaintiff to conduct deep breathing exercises.

167. On November 09, 2018, plaintiff reported to the therapist that he still feels pain but the stiffness is minimally reduced due to taking Naproxen and doing stretches. On this day, plaintiff conducted stretches and ROM exercises and received TENS therapy.

168. On November 13, 2018, plaintiff reported to the therapist that he continued to experience nerve pain on his back and neck region, especially when conducting stretches and ROM exercises. Plaintiff was advised to practice breathing exercises

to cope  with anxiety as it is causing pain as well.  On this
day, plaintiff conducted stretches and ROM exercises and received
TENS therapy.

169. On November 16, 2018, plaintiff reported to the
therapist that he was under a lot of stress and anxiety for he
was being retaliated for filing a complaint against an Officer.
Therefore, plaintiff was moved to a double-lock cell  in
retaliation where he was unable to perform the stretches due to
issues with incompatible cell-mates. Plaintiff complaint that he
was in more pain. On this day, plaintiff conducted stretches and
received TENS therapy.

170. On November 20, 2018, plaintiff reported to the
therapist that he was still felling nerve pain both in the back
and neck region, especially when the neck is positioned
differently. On this day, conducted strengthening exercises and
received TENS therapy.

171. On November 27, 2018, when plaintiff arrived to clinic
for therapy, Officer Witfield directed him to go wait in the
bullpin. For certain reason, plaintiff became very anxious and
stressed. Ofc. Witfield refused to hear plaintiff's issues as he
tried to address it Twice. Due to plaintiff's mental conditions,
plaintiff refused  physical therapy on this day.

172. On November 30, 2018, plaintiff reported to the
therapist that he is more flexible with physical therapy but

still gets the nerve pain in neck and back region with certain movement.  Also, he is unable to sit for long time due to pain and burning sensation in thoracolumbar region. On this day, plaintiff conducted muscle stretches and ROM exercises and received TENS therapy. Plaintiff was further advised to keep conducting breathing exercises to cope with anxiety. Plaintiff was discharged from physical therapy.

173. In a letter dated, December 05, 2018, plaintiff's PCR Attorney John V. Saykanic requested with NJSP prison administration to provide proper medical treatments for the painful injuries plaintiff suffered during transportations in the NJDOC Vans, as the NJSP medical Dept. refused to perform proper medical examination and treatment for plaintiff's severe neck and back nerve pain, but to no avail.

174. On January 06, 2019, plaintiff submitted a sick call Form-007 requesting adequate medical treatment as his back and neck nerve pain continued to persist imposing  restrictions on plaintiff's ability to conduct one or more major activity, i.e.,(including but not limited to) trouble sitting for more than 10-minutes, trouble sleeping at night due to pain and numbness, severe trouble with concentration, and constant headache.

175. On January 10, 2019, plaintiff briefly consulted with Dr. Robin Miller. When plaintiff complaint to Dr. Miller

that "I'm having nerve pain in the neck and back area, doctor
said, "you need to tell me again because it is my first time
treating you and I don't know your chart." As soon as plaintiff
had begun to describe his painful symptoms and the unlawful NJDOC
van  rides, Dr. Miller interrupted plaintiff and said, "I will
put you on Roboxin" and "keep doing the exercises," which will
slow "down your arthritis." When plaintiff  pleaded with Dr.
Miller to hear everything about his painful symptoms and the van
ride ·injuries, Dr. Miller said, "I'm the doctor here ... I know
what I'm doing," and instructed plaintiff to leave. Plaintiff
again  pleaded with the doctor to consider ordering an MRI of his
back and neck, but to no avail. For the second time, Dr. Miller
ordered plaintiff to leave the clinic or "I will have an officer
lock you up." Plaintiff left the clinic for fear of retaliation.

176.  On January 29, 2019, plaintiff filed a
Inquiry/grievance addressing his ongoing severe pain on his back
and neck area and pleaded for adequate examination then render
proper treatment, as his repeated pleading for adequate treatment
had been denied. Plaintiff received a final response to his
grievance on May 17, 2019 by Nurse Susan Spingler that "You  have
been advised on how to access medical treatment."

177. On January 30, 2019, plaintiff submitted a sick call
Form MR-007 requesting proper medial treatment for his back and

neck pain as the medication Roboxin did not have any effect on plaintiff's severe nerve pain.

178. On February 01, 2019, plaintiff consulted with a Nurse the severe nerve pain he was experiencing, which was limiting his ability to perform daily activities. Plaintiff was advised that he will be scheduled to see a provider and was dismissed.

179. On February 06, 2019, plaintiff consulted with Dr. Miller for the second time. During the consultation, plaintiff conveyed to the doctor that since his last Two (2) NJDOC van rides on September 13 and 19 of 2018, the nerve pain on his back and neck had gotten worst and it did not go away. Plaintiff explained to the doctor that he was bounced around in the NJDOC van causing his head to repeatedly hit the walls and the ceiling very hard and other injuries as stated in paragraphs 82 through 93.

180. Without conducting any physical examination, Dr. Miller said, "I'm going to order X-rays of your neck" and "will prescribe you Motrin for pain." Plaintiff pleaded with the doctor, "how many times the medical going to take the same X-rays and tell me 'your latest xray results are normal?,'" and begged to order an MRI of plaintiff's back and neck. Dr. Miller further advised plaintiff that "we have to try every treatment before they can even consider approving you for an MRI ... MRI is not cheap." Dr. Miller dismissed plaintiff by advising him that he

will be called  back to discuss x-ray results and possible new treatments and denied plaintiff's request for a neck/back brace due to policy.

181. On February 07, 2019, x-rays of plaintiff's Cervical Spine 2 or 3 views were taken, but the plaintiff was never called to the clinic to discuss the x-ray results or follow up treatments based on the new x-ray results.

182. On February 12, 2019 and  on March 11 and 22,  2019, plaintiff's PCR Attorney Saykanic implored with Mervin Ganesh (Associate Administrator) during a phone conversation to render plaintiff proper medical treatments for his severe back and neck nerve pain and to accommodate adequate/safe transportation  in the future, but without much success.

183. On March 16, 2019, plaintiff filed another sick call Form MR-007 requesting proper medical treatment for his back and neck nerve pain, as the pain were unbearable, especially at night while sleeping, but to no avail.

184. On March 20, 2019, plaintiff filed another sick call Form-007 requesting proper examination and treatment for his severe back and neck nerve pain.

185. On March 22, 2019, during the nurse call, plaintiff conveyed to Nurse Scott that his back and neck pain "is really bad," to the extend, that he is having trouble sleeping at night and unable to sit for longer than 10 minutes. Nurse Scott advised

plaintiff that "I cann't do nothing for  you ... you will be
scheduled to see a doctor within a week." The nurse dismissed
plaintiff without rendering any treatment.

186. On April 01, 2019, plaintiff filed a grievance with the
NJDOC Central Office that his repeated request for back and neck
nerve pain, which the plaintiff assumed that the pain is deriving
from the repeated injuries that he had  sustained in the NJDOC
vans, are being deliberately denied for non-medical reasons and
in retaliation. Plaintiff specifically noted that he has not been
seen by a doctor despite the fact he recently  filed Two (2) sick
call Forms MR-007 requesting adequate treatments on March 16 and
20 of 2019.

187. On April 02, 2019, plaintiff's PCR Attorney Saykanic
made further request in a letter to NJSP Associate Administrator
Ganesh "that he [plaintiff] be treated for his back ailment," as
plaintiff was struggling to sit for more than Ten (10) minutes to
perform activities, but to no avail.

188. On April 08, 2019, plaintiff filed another
grievance requesting adequate medical treatment for his severe
back and neck pain and to stop retaliating in the form of
charging unlawful co-pays and by delaying medical treatments for
filing grievances. On April 13, 2019, Susan Spingler responded
"We apologize for the delay. You will be seen by the provider
this week. ..."

189. On April 18, 2019, plaintiff consulted with NP. Jackson about his nerve pain on back and neck area. Plaintiff told NP. Jackson that he was experiencing severe nail stabbing like pain, numbness, and stiffness on his neck extending to lower back; and sharp shooting pain into his left arm. As a result (including but not limited to), plaintiff was having trouble sleeping at night and can not sit for longer than 10-minutes. Thereafter, plaintiff inquired about the recent xray results taken on February 07, 2018. NP. Jackson advised plaintiff that according to the doctor, x-ray reveled "you have arthritis[6]." At this point plaintiff asked "if arthritis is causing pain on my neck, what is causing pain on my back and the sharp shooting pain into my left arm?" NP. Jackson advised plaintiff "I will order x-ray of your back and call you back to discuss the results next week," and he was directed to take x-rays of his Lumbar Spine AP and LAT.

190. On April 23, 2019, plaintiff noticed a new medication being administered to him among his other prescriptions. Upon inquiry with the nurse about the new pill, the nurse said, "It is Vitamin-D to strengthen your bone."

---

[6] It was on April 18, 2019, plaintiff, for the first time, had realized with some uncertainty based on the xray's result (xrays taken on February 07, 2019) that his nerve pain are a result from the injuries he had repeatedly sustained during the NJDOC van transportations, as oppose to suffering from "arthritis" as advised to the plaintiff by the NJDOC medical professionals.

Plaintiff refused the vitamin-D pill as it was prescribed to him without his knowledge and consent; and on April 24, 2019, plaintiff refused the vitamin-D pill. Therefore, the nurse advised plaintiff that she "will flag the medical to consult with you."

191. On April 26, 2019, plaintiff filed an Inquiry/Grievance requesting the status of his recent x-ray results and to stop prescribing him medication without first consulting with him. Moreover, to render plaintiff adequate examination and proper medical treatment for his severe back and neck pain.

192. On May 02, 2019, when plaintiff refused to take his vitamin-D pill again, the nurse asked him, "Have you not seen a provider to discuss the pill and your nerve pain?" Plaintiff answered "No." The nurse advised plaintiff that she "will be putting an emergency sick call slip to see someone today." Later this day, plaintiff was directed to go to the clinic on an emergency pass.

193. On May 02, 2019, during the emergency medical pass, plaintiff consulted with NP. Jackson. Upon plaintiff's inquiry as to why he is being prescribed vitamin-D, NP. Jackson said, "Dr. Miller diagnosed you with arthritis ... [Vitamin-D] to strengthen your bones." Plaintiff conveyed to NP. Jackson that his nerve pain is very bad and he is unable to do many normal

things physically. Plaintiff pleaded with NP. Jackson that his nerve pains are from the injuries that he had repeatedly sustained during transportation in the NJDOC Van. Plaintiff begged with NP. Jackson, as had with all the medical professionals in the past, to "please watch the surveillance camera recording on the NJDOC vans" to see how violently plaintiff had bounced around and how his head had repeatedly hit the compartment's wall and the ceiling of the NJDOC vans since no one seems to believe him that these injuries had occurred during transportaion. Plaintiff begged to conduct an MRI on his back and neck to detect the potential injury causing the nerve pain.

194. At this point, NP. Jackson advised plaintiff  that "I will request for an MRI on your neck and back but there is no guarantee they will approve you for it." Twenty (20) minutes later, NP. Jackson came back and advised plaintiff that he is approved to receive an MRI for his neck only and denied for his back. Plaintiff requested for a neck and a back brace to prevent furthering his injury and to alleviate his pain but it was denied per "DOC policy." Plaintiff was further advised to take his vitamin-D pill as it could only help strengthen "your bones." Plaintiff was then dismissed from the clinic.

195. On June 07, 2019, plaintiff filed an Inquiry/Grievance requesting that he be transported in a safe NJDOC van with adequate safety features, that is, a van without

the design defects.  On June 08, 2019, Nurse Susan Spingler responded "You are currently ambulatory and not ordered an other means of transport."

196. On June 11, 2019, Plaintiff was directed to go to NJSP intake for a hospital trip to conduct MRI on his neck. At the intake, plaintiff inquired with officer as he was being handcuffed and leg-shackled whether he was being transported in a safe NJDOC van or in a defectively designed van's compartment? Officer said, "you're being transported in a dog-pound [i.e., in the flawly designed compartment]." Therefore, plaintiff refused to go as he feared sustaining more new injury since the van ride could make  the existing pain and injury more severe. Plaintiff was advised by the intake officer that "medical has to authorize you for special transportation" and dismissed him by directing him to "go to clinic first."

197. When returned to the clinic from the intake, plaintiff pleaded with Nurse Spingler to accommodate him proper transportation to prevent pain on his neck/back and to prevent from exacerbating the existing injury.  Nurse Spingler advised to plaintiff that "all transportations are decided by the custody ... talk to custody." When I requested to speak with Nurse Spingler's supervisor, she said, "I'm the supervisor ... if you don't like my decision, go head and file a grievance" and plaintiff was dismissed from the clinic. Therefore, when

plaintiff returned to the Unit, he had submitted an

Inquiry/Grievance requesting to transport him in a safe NJDOC van

with adequate safety features and in a van without design

defects. On June 13, 2019, Nurse Susan Spingler's final response

was that "You were seen in the clinic on the day of your

scheduled trip and advised there was no order for a special

transport vehicle. Your concerns regarding the size and safety of

the vehicle should be referred to DOC."

198. On July 02, 2019, plaintiff consulted with Dr.

Francis J. Paizzi, MD, at St. Francis Hospital, who had conducted

proper examination of plaintiff's neck and advised him that  MRI

scan of  his cervical spine will be ordered; and On August 16,

2019, MRI scan of plaintiff's cervical spine was conducted.

199. On August 01, 2019, plaintiff submitted an

Inquiry/Grievance requesting whether or not he could receive

nerve pain medication (not motrin) and a neck brace/back brace to

alleviate the pain as to help conduct one or more major

activities, i.e., (including but not limited to) able to sit for

longer than 10 minutes,  able to sleep at night longer than 2 to

3 hours, but to no avial.

200. On August 05, 2019, plaintiff consulted with

Nurse Jane Doe-20 the severe nerve pain he was experiencing and

how he were unable to sit for longer than 10-minutes due to the

sharp nail stabbing like pain shooting into his back and left

harm. Moreover, plaintiff conveyed that he is having to wake-up too often at night from numbness and nerve pain. Nurse Doe-20 advised plaintiff that there is nothing "I could do for you ... you will be called back to see a provider in few days," but plaintiff was never called back to see a provider to address the pain. In addition, plaintiff was advised that "you could request with the provider for a neck/back brace."

201. Per plaintiff's request on August 31, 2019, as to the status of MRI scan results of his cervical spine, plaintiff was consulted with Dr. Aga (phonetic) on September 03, 2019. Dr. Aga advised plaintiff that "you have a defect at the C5-C6 level" (i.e., At C5-C6, there is a posterior disc osteophyte complex somewhat asymmetric to the left resulting in mild left neural foraminal narrowing) according to the MRI scan result. Doctor further conveyed to plaintiff Dr. Pizzi's recommendation either to receive "a cervical epidural steroid injection" to cope with the severe nerve pain or the doctor thinks that "it may be more appropriate to consider a surgical approach" to correct the defect causing the nerve pain at C5-C6 level[7].

---

[7] Plaintiff do not know exactly during which NJDOC van transportation he may had sustained the C5-C6 level defect, though the nerve pain on his back and neck presisted after the NJDOC van rides to and from the Court trips on September 13, 2018 and on September 18, 2018. Plaintiff became aware of his C5-C6 level injury with certainty only after receiving the MRI results.

POST MRI INADEQUATE MEDICAL TREATMENTS

202. On September 25, 2019, plaintiff consulted with Dr. Aga (phonetic) to treat his never pain (and other medical issues), especially the sharp nail stabbing like pain extending to his lower back, which was preventing plaintiff from sitting for longer than 10 minutes and issues with sleeping at night longer than Two (2) hours due to numbness and severe nerve pain. Plaintiff further conveyed to the doctor that since his last visit with the doctor on September 03, 2019, no xrays of is back has been taken per his order. Dr. Aga advised plaintiff that "you're scheduled for taking back xrays ... you will be consulting with a neurologist to discuss treatment for your nerve pain." Plaintiff was further advised "per policy, no back/neck brace will be issued."

203. On October 15, 2019, plaintiff consulted with Dr. Scott Strenger, MD, (Neurosurgeon) at St. Francis Hospital with regarding treatment options of plaintiff's C5-C6 level defect, which is causing the severe nerve pain. After a thorough examination, Dr. Strenger had opined that it would be better to first  treat the nerve pain with epidural steroid injection to alleviate it, and a surgical approach shall be taken should the pain become uncontrollable and when there is a significant neural compromise. Plaintiff accepted Dr. Strenger's medical advise to

first receive epidural steroid injection for his severe nerve
pain.

204. On November 06, 2019, plaintiff consulted with NP.
Jackson concerning treatment for his nerve pain, especially the
sharp shooting pain extending to his lower back. NP. Jackson
advised plaintiff that "if your injury is at the neck level,  you
may feel nerve pain from your neck to the bottom of your
feet." Further advised plaintiff to be  patient as "you are
scheduled to be consulted with someone at pain management."

205. On November 22, 2019, plaintiff had a video conference
with Dr. Maher Ibrahim, MD, with respect to receiving epidural
steroid injection. After asking plaintiff some standard
questions, Dr. Ibrahim advised him that he will be seen by him
soon to administer the injection for nerve pain.

206. On January 13, 2020, plaintiff filed an
Inquiry/grievance with the medical department inquiring "what is
the status on the prescribed treatments for my severe neck and
back pain issues? I'm having trouble sitting for more than 10-
minutes to do legal work and other activities as the nerve pain
on my [plaintiff's] back and neck is getting unbearable...."
Therefore, plaintiff requested to expedite the treatment and to
accommodate him a back and neck brace to sit and perform legal
work (and other activities) as plaintiff have no table and chair
in his cell, but to no avail.

207. On January 20, 2020, Susan Spingler responded to plaintiff's inquiry that "You have been approved for injections and are pending a date."

208. On March of 2020,  plaintiff had repeatedly and daily came in contact with Inmate Patric Shanly who was housed several cells from the plaintiff's cell had died form COVID-19. As a result by April 03, 2020, plaintiff had fallen very sick exhibiting COVID-19 symptoms, i.e., (including but not limited to) sever nerve pain on his back/neck exacerbated by COVID-19 (and other painful symptoms associated with Coronavirus), which prevented plaintiff form functioning during day time and prevented him from further sleeplessness at night.

209. On April 04, 2020, plaintiff submitted an electronic sick call Form-007 requesting adequate medical treatment for his physically debilitating painful nerve pain (and other symptoms) due to COVID-19, but to no avail.

210. On April 07, 2020, plaintiff submitted a second sick call Form-007 requesting medical attention to treat his severe nerve pain and COVID-19 symptoms, but to no avail.

211. From April 04 through 16 of 2020, every day plaintiff had requested  and inquired with the nurses, who had administered his daily medication on Unit-2R,  and with Unit-2R Officers to inform medical department to afford him medical treatments for his painful conditions, but to no avail.

212. On April 15, 2020, Nurse Baca electronically responded to plaintiff's request for medical attention that "This is a request for medical care and therefore will be treated as a MR007/sick call slip. You will be charged a copay, per policy."

213. On April 17, 2020, plaintiff had consulted with Dr. Aga that he is experiencing severe nerve pain on his back and neck region ever since he has lost his sense of taste, smell, coughing, trouble breathing and sleeping, body ache, on and off fever. Therefore, plaintiff requested a COVID-19 test and some form of effective temporary treatment for nerve pain other than Tylenole or Motrin, as these pills did not help to alleviate nerve pain. Dr. Aga advised plaintiff that "it is not up to me to give you [plaintiff] a COVID-19 test" and "per policy, I'm only allowed to prescribe Tylenole or Motrin for pain." Plaintiff's request for a back and a neck brace to reduce the  strain and nerve pain on his back/neck while sitting on a makeshift chair was denied, per policy.

214. On May 01, 2020, plaintiff filed a grievance with the medical department requesting "to take proper action to provide inmates/me [plaintiff] proper medical/dental/mental health treatments" as the medical professionals' failed to render plaintiff adequate medial treatments for over Two (2) weeks not only for his severe nerve pain exacerbated by Coronavirus but also for his severe Coronavirus symptoms. From March through May

of 2020, plaintiff continued to experience severe nerve pain and other symptoms associated with Coronavirus without adequate medical treatments.

215. On May 19, 2020, plaintiff received a COVID-19 test after his repeated request with the NJDOC Officials for a COVID-19 test, plaintiff received a COVID-19 test, which came back tested positive for Coronavirus.

216. On May 23, 2020, plaintiff was directed by Ofc. Franscis-III that he was tested positive for COVID-19 and directed him to "pack-up to be quarantined."

217. Plaintiff was moved to a condemned Unit (i.e., Unit-7UP-Teir-10-Cell-23) to be quarantined. Plaintiff was feeling very weak and experiencing severe nerve pain, but he was directed to carry his limited personal effects Four stair cases to his cell-23.

218. Plaintiff's quarantine cell-23 was unsanitary with visible dust, rat feces on the floor, human bodily waste/fluid throughout the cell wall and on the toilet/sink. Plaintiff reported to the Officer that the cell is uninhabitable, but to no avail. Officer advised plaintiff that he is aware of all the cells are in unsanitary conditions and he had reported the poor conditions to the administration. Officer offered plaintiff a broom and mop to clean the cell without any disinfectant. Plaintiff had requested with Officer to speak with a Supervisor

John/Jane Doe-30, but no supervisor came to speak with him.
Officer advised plaintiff that he had no choice but to lock-in
Cell-23, otherwise plaintiff will "face a charge  and go to lock-
up." Therefore, plaintiff quickly swept and mopped the floor
without much success and locked-in an unsanitary Cell-23, per
Officer's order.

219. From May  23, 2020  through June 01, 2020, plaintiff
was quarantined without any adequate medical attention for his
severe COVID-19 symptoms, especially for his severe nerve pain,
other than the nurses came to administer plaintiff's regular
medication, Twice a day to take temperature and/or to administer
COVID-19 test.

220. On May 23, 2020, plaintiff requested with the Nurses
both in the morning and in the evening adequate medical
treatments, at the very least, to request a doctor to consult
with plaintiff to treat his symptoms associated with COVID-19. In
particular, for the severe nerve pain exacerbated by the
Coronavirus and for the  pimple/blister that was growing under
plaintiff's tongue ever since he had lost his sense of taste and
smell since the end of March 2020. The nurse had advised
plaintiff that the plaintiff's request will be forwarded to a
provider. During P.M. medication, Nurse had given plaintiff
small bags of salt and directed him to rinse his mouth as a
temporary treatment for the pimple. On this day, plaintiff

remained in his very hot and unsanitary cell-23 all day without affording any activity outside the cell, except for a shower and a phone call.

221. On May 24, 2020, plaintiff did not receive his regular A.M. medication. When Nurse Jane Doe-31 came to take plaintiff's temperature, he requested for A.M. medication and nerve pain mediation as Tylenol is not working. Moreover, plaintiff informed Nurse Doe-31 that he has no sense of taste (and smell) since the end of March 2020 and he has a pimple/blister growing under his tongue, trouble breathing, headache, and nerve pain. Plaintiff then showed Nurse Doe-31 the pimple under the tongue. Nurse Doe-31 said, "I will flag the provider your issues to be treated." Later in the evening, plaintiff again made similar requests with Nurse John/Jane Doe-32 as noted above, but to no avail. On this day, plaintiff remained in his very hot and unsanitary cell-23 all day without affording any activity outside the cell, except for a shower and a phone call.

222. On May 25, 2020, no nurse came to take plaintiff's temperature. Plaintiff requested with Nurse John/Jane Doe-33 while receiving  A.M. medication to afford him adequate medical treatment for his COVID-19 symptoms and for the severe nerve pain on his back and neck region. When plaintiff had inquired "why no doctor have not came to treatment, since I have been tested positive for COVID-19?" Nurse Doe-33 advised plaintiff that "I

will submit your issues with my supervisor." Later that evening,
plaintiff again made similar requests with Nurse John/Jane Doe-34
as noted above, but to no avail. On this day, plaintiff remained
in his very hot and unsanitary cell-23 all day without any
requested medical attention and without affording any activity
outside the cell, except for a shower and a phone call.

223. On May 26, 2020, plaintiff consulted with Nurse Susan
Spingler while she was there to see other Inmates on the
quarantine Unit-7UP. Plaintiff asked Nurse Springler "why my
repeated request for medical treatment (including but not limited
to) for my severe nerve pain, coughing, the pimple growing under
the tongue, trouble breathing, fluctuating fever, and headache
are being ignored?" Nurse Spingler answered, "...because you
didn't file a sick call form," and she walked away by saying "put
in a sick call form." Per Nurse Spingler's direction, plaintiff
submitted a sick call Form MR-007 later that evening. On this
day, plaintiff remained in his very hot and unsanitary cell-23
all day without any requested medical attention and without
affording any activity outside the cell, except for a shower and
a phone call.

224. On May 27, 2020, plaintiff received his Second (2)
COVID-19 test. Plaintiff requested with the Nurses, both in the
morning and in the evening, for adequate medical treatments for
his ailments as stated in paragraphs 219 through 222, but to no

avail. When plaintiff complaint to the P.M. nurse that "no matter how many times I requested for treatment, no one seems to responding to it," the nurse answered, "I could only submit your request for treatment ... it is not me who schedule for medical treatment ... I'm not a doctor."  On this day, plaintiff remained in his very hot and unsanitary cell-23 all day without any requested medical attention and without affording any activity outside the cell, except for a shower and a phone call.

225. On May 28, 2020, plaintiff received a Third (3) COVID-19 test. For the Second time, plaintiff consulted with Nurse Susan Spingler request for adequate medical treatments for his severe nerve pain and COVID-19 symptoms as stated in paragraphs 219 through 223; and informed  Nurse Spingler that plaintiff had submitted a sick call Form MR-007, dated May 26, 2020, requesting for adequate medical treatment. Nurse Springler answered, "I didn't receive your sick call form because you didn't do it on JPay ... file another one on JPay." Plaintiff advised Nurse Springler that the Kisosk or the JPay machine is broken on his tier. Therefore, unable to file an electronic sick call Form MR-007.

226. Nurse Spingler advised plaintiff to "file another sick call form ... you will be charged a co-pay," and walked away from plaintiff's cell. Plaintiff later requested with Second shift Officer John Doe-35 for a sick call Form MR-007, but he did not

have a form on Unit-7UP. Officer Doe-35 advised plaintiff that he will "try to get you one when I go on break," but Officer Doe-35 never accommodated plaintiff a sick call form to make request for adequate medical treatment.  On this day, plaintiff remained in his very hot and unsanitary cell-23 all day without any requested medical attention and without affording any activity outside the cell, except for a shower and a phone call.

227. On May 29, 2020, plaintiff made request with both A.M. and P.M. nurses to convey his repeated request for proper medial treatments with appropriate medical professionals as stated in paragraphs 219 through 225, but to no avail. Because of the unsanitary living conditions, inadequate medical treatments, no access to medical forms, and supervisor's denial to speak with plaintiff, he had called the NJDOC Ombudsman via phone and made a complaint. The Ombudsman had advised plaintiff that he will forward the complaints to the NJSP prison administrator. Plaintiff again made request with Officer John/Jane Doe-36 for a sick call Form MR-007, but it was never accommodated to him.  On this day, plaintiff remained in his very hot and unsanitary cell-23 all day without receiving any requested medical attention and without affording him any activity outside the cell, except for a shower and a phone call.

228. On May 29, 2020, plaintiff filed a grievance addressing numerous issues (including but not limited to), i.e., the

unconstitutional living conditions, inadequate medical treatments for his severe nerve pain and for COVID-19 symptoms and no access to medical forms. However, plaintiff never got a response for his grievance, which he had submitted with the second shift Officer for processing.

229. On May 30, 2020, plaintiff continued to experience severe nerve pain on his back and neck region. The blister under plaintiff's tongue caused him discomfort when speaking and pain while eating. Plaintiff again made request with both A.M. and P.M. nurses to convey his request to appropriate medical staff to receive proper medical treatments. Moreover, when the plaintiff expressed his frustration to the nurse for not receiving any medical attention, the nurse answered, "I'm only able to forward your complaint with the medical, but it is not up to me what to do with your complaints." Upon plaintiff's repeated requests, he had finally received a sick call Form MR-007 from the Officer. On this day, plaintiff remained in his very hot and unsanitary cell-23 all day without receiving any requested medical attention and without affording any activity outside the cell, except for a shower and a phone call.

230.  On May 31, 2020, plaintiff submitted a sick call Form MR-007 requesting adequate medical treatment for reasons stated on paragraphs 218 through 227, as the plaintiff continued to experience severe nerve pain and symptoms associated with COVID-

19, especially due to the discomforts caused by the blister growing under his tongue.  On this day, plaintiff remained in his very hot and unsanitary cell-23 all day without receiving any requested medical attention and without affording any activity outside the cell, except for a shower and a phone call.

231. On June 01, 2020, plaintiff continued to experience severe sharp shooting/radiating nerve pain into his back and neck region extending to his left arm, and the blister under his tongue seems to grew large causing more discomfort and pain while speaking and eating. Plaintiff inquired with the A.M. nurse that when will he be seen by a doctor to address his painful  medical issues? As no doctor had came to consult with the plaintiff, ever since he had been moved to the quarantine Unit-7UP for testing positive Coronavirus. The nurse had advised plaintiff that "I don't know how they are doing things with the quarantine inmates ... but I will pass your concern to my supervisor." Later this day around 5:00p.m., plaintiff was discharged from the quarantine Unit-7UP after tested Two (2) negatives for COVID-19 without affording him any medical treatments. Nonetheless, plaintiff continued to experience ongoing  severe nerve pain and symptoms associated with Coronavirus for several more weeks/months.

232. On June 03, 2020, plaintiff consulted with Dr. Jane Doe-37. plaintiff had conveyed to Dr. Doe-37 that he has been experiencing severe nerve pain and numbness on his back and neck

area radiating into his left arm, which is preventing him form

sleeping at night and unable to sit-up for longer than Ten (10)

minutes. In addition, plaintiff complaint to the doctor that he

can not taste and smell anything since the end of March 2020, and

showed the doctor the blister grown under his tongue. Dr. Doe-37

looked inside  plaintiff's mouth from a distance and said, "I'm

going to refer  you to the dentist." Thereafter, Dr. Doe-37

advised plaintiff that there is nothing "I could do for your

nerve pain now ... you're approved to receive an injection."

233. Plaintiff was further advised upon inquiry with Dr.

Doe-37 that she does not know when he will be administered the

injection. When plaintiff requested for some form of temporary

nerve pain medication (other than Tylenol/Motrin) and a neck/back

brace to alleviate the nerve pain, it was "denied per DOC

policy."

234. Plaintiff was examined by Dr. John Doe-38 (Dentist) the

blister that was growing under his tongue. Dr. Doe-38 had advised

plaintiff that the growth of the blister is triggered by

Coronavirus, and that the blister either will go away by itself

or it has to be surgically removed. When plaintiff requested

treatment for pain, lose of taste and smell, the Dr. Doe-38 said,

"There is not treatment for the [Corona]virus." Plaintiff was

instructed that he will be called back to be seen by surgeon to

remove the blister, and he was dismissed without rendering any medical treatment for the painful symptoms.

235. On July 24, 2020, per plaintiff's request, he had a follow-up schedule with the dentist Dr. Doe-38 as the blister under his tongue continued to cause pain and discomfort, though it had slightly receded. Plaintiff was quickly examined by Dr. Doe-38 and said, "Looks like it [the blister] is going away by itself." Plaintiff was again denied proper treatment and medication to cope with pain and discomfort while eating and speaking. Plaintiff continued to experience severe nerve pain radiating into his left arm and sharp nail stabbing like pain extending into his lower back region preventing him form performing One or more major activity (including but not limited to) unable to sit for more than Ten (10) minutes, difficulty sleeping at night due to severe nerve pain and numbness, trouble with concentration, experiencing severe stress, anxiety, depression, and headache.

236. On October 05, 2020, plaintiff was called to the medical clinic to sign medical treatment consent form to receive injection for his severe nerve pain on his neck. During plaintiff's consultation with Nurse Jane Doe-39, he pleaded with her to transport him in a safe NJDOC Van that had adequate safety features, especially not in an inmate passenger compartment where plaintiff having to sit in an abnormal posture  or sit in a

bow position due to design defect. Plaintiff had further
explained to Nurse Doe-39 that it causes severe nerve pain on his
neck/back region when forced to sit in an abnormal position and
could make the neck injury and pain worst from violent jarring
and abnormal movement of the neck. Nurse Doe-39 had advised
plaintiff, "There is nothing I could  about your transportation
to the hospital ... you need to talk to the custody." The further
advised plaintiff that "if you refuse to go to hospital due to
transportation issues, you could possibly wait another year or
more to be scheduled for an injection."

237. When plaintiff conveyed to the nurse that the custody
had advised him that without the medical's referral no special
transportation is accommodated. At this point, Nurse Doe-39
answered to plaintiff, "I will forward your concern to my
supervisor," and signaled the officer to order plaintiff to
leave the clinic. As the officer directed plaintiff to leave the
clinic, plaintiff requested with Nurse Doe-39 to speak with her
supervisor, but it was denied and advised him to file a grievance
with the prison administration.

238. On October 06, 2020, plaintiff filed an (ADA)
Inquiry/Grievance with the prison administration requesting
adequate accommodation to prevent from experiencing severe pain
on his neck and back while being transported to and form
hospital.

239. On October 13, 2020, plaintiff was called to NJSP intake to be transported to the hospital. After plaintiff was handcuffed to belly-chain and leg-shackled, he was escorted to a NJDOC Van. Plaintiff was instructed to enter an unlawful inmate passenger compartment, as described in paragraphs 80 through 92. Before entering the NJDOC Van's compartment, plaintiff quickly pleaded with the officer to transport him in a safe van. The officer said, "There is nothing I could do about the van ... I'm just here to transport ...." Plaintiff not wanting to suffer severe nerve pain for another year or more by refusing to go in the transportation van, he unwillingly decided to travel in the unlawful inmate passenger compartment to the hospital. After entering the compartment, plaintiff asked the officer to assist him strap on the waist seat belt. Officer reached and picked up the waist seat belt and gave it to the plaintiff to strap on.

240. The van ride was approximately Five to Fifteen minutes to the hospital from NJDOC. Though plaintiff was not bounced around when the van was in motion, but he had endured excruciating nerve pain on his neck and back region as he was forced to sit in an abnormal position and from jarring and abnormal movement of his neck and upper body while the van made sudden turns and breaking.

241. Plaintiff was heavily sedated for the spinal injection. Post procedure, plaintiff continued to experience the heavy

effect of the anesthesia and severe nerve pain on his neck/back.
Nonetheless, plaintiff was handcuffed to belly-chain and leg-
shackled then ordered to enter the unlawful NJDOC van's inmates
passenger compartment to be transported back to the prison.
Plaintiff was transported unsecured and in severe nerve pain
while he were heavily sedated; therefore, not knowing to what
extend he may have had sustained further injury to his neck and
back from the unlawful van ride.

242. On October 26, 2020, plaintiff received a response to
his Inquiry/Grievance from Amy Emrich that was submitted on
October 06, 2020, concerning safe transportation accommodation
stating, "Please discuss your transport concerns with the medical
provider."

243. On November 10, 2020, plaintiff filed another ADA
Grievance with the administration for their failure to
accommodate adequate transportation without subjecting him to
severe nerve pain. On November 24, 2020. Fathom Borg responded
that "Your concerns are noted. Medical staff coordinates
appropriate transport per medical necessity. Any future issues
can be directly addressed to Medical." After plaintiff appealed
the response on November 27, 2020, he received a final response
from Jonathan Gramp that "Your concerns are noted. Transportation
is provided in a safe secure manner. If medical determines a
higher level of transportation is needed, the DOC accommodates."

## RETALIATION

244. Plaintiff repeat and allege paragraphs 80 through 243 above as if the same had been set forth herein and adds the following:

245. Plaintiff was first charged Five Dollar ($5) co-pay for his request to treat neck and back nerve pain on March 03 or 04, 2018 for the consultation with the provider on March 02, 2018.

246. On March 19, 2018, since plaintiff were not scheduled a follow-up consultation to discuss xrays result, plaintiff requested to discuss xrays result taken on March 08, 2018 of his cervical vertebrae. Nurse Diana Baca responded on March 26, 2018, "this request for medical care will be treated as a MR007/sick call slip. You will be charged a copay, per policy." Though, plaintiff was advised on March 02, 2018 that he will be called back to discuss the xrays result without plaintiff's request as a follow-up treatment warranting no co-pay.

247. On March 28, 2018, when plaintiff arrived at the clinic, Ofc. Merrel directed plaintiff to stand by the wall and wait. Several minute later, plaintiff noticed Nurse Susan Spingler speaking to Ofc. Merrel while looking at plaintiff's hand, which had a small piece of paper with written medical questions to ask the doctor/nurse and a safety pen to take notes. Thereafter, Ofc. Merrel approached plaintiff and asked "What the

fuck is in your hand?" Plaintiff responded, "It is a safety pen
and a paper with medical notes." Plaintiff tried to reason with
Ofc. Merrel that "taking medical notes during consultation and
bringing medical notes to ask questions to doctor were never an
issues before." But Ofc. Merrel ordered plaintiff, "I don't give
a fuck what you were allowed to do before ... take that shit back
to your unit." Plaintiff quickly returned to the unit to drop off
the medical note and the safety pen and returned to the clinic to
see the nurse.

248. When plaintiff returned to the clinic, Ofc. Merrel
aggressively searched plaintiff in hostile manner after pushing
him against the wall/door, then directed him to "go fuckin sit in
that chair" to see the nurse. As defendant started to ask
questions about his xray results, he requested with Nurse Somuah-
oduro to provide him a small piece of paper and a safety pen to
take note. As soon as plaintiff received a paper and a pen, Ofc.
Merrel burst into the room yelling, "you can't fuckin have that"
and snatched the pen and the paper from plaintiff's hand and
ordered him to "take your fake ass back to your fuckin unit."

249. Plaintiff calmly requested to speak with Ofc. Merrel's
supervisor to complaint his interference with medical treatment
and for his misconduct towards the plaintiff, but he denied.
Thereafter, Ofc. Merrel threaten plaintiff to "lock you up if
you don't fuckin leave." Just when plaintiff was about to leave,

Nurse Vetereni (phonetic) interejected and directed plaintiff to "please  wait in the room" and quickly continued with the consultation. Plaintiff was advised that he will be called back within Seven (7) days to consult with a provider to discuss his xrays result and his ongoing back/neck nerve pain issues. As Plaintiff was leaving the clinic, Ofc. Merrel told  Nurse Spingler "he better be fuckin charge[d] $5 co-pay ... aint nothing wrong with him" and the nurse said "you bet  he will" be. Plaintiff was further advised by Ofc. Merrel not to return to the clinic for work and threaten to fire him from his prison Job if he did.

250. On April 02, 2018, for the second time, plaintiff was charged $5 co-pay for the back/neck pain follow-up consultation on March 28, 2018. Plaintiff begged with the provider not to charge him co-pay as it will cause him hardship in the many form, shape, and manner. Provider advised plaintiff that there will be no co-pay charged as "this is a follow-up" and "I will convey your concern to my supervisor."

251. On April 02, 2018, plaintiff had a follow-up consultation with a provider. Plaintiff again pleaded with the provider not to charge him unwarranted co-pays as "it is causing me hardship" and "I will refuse the treatment if you keep charging me co-pay for  inadequate medical treatments."  The provider had advised plaintiff that "there will be no co-pay for

this follow-up" and "it is not me [the provider] that decides who gets charged co-pays." However, on April 09, 2018 For the Third (3) time, plaintiff was charged $5 co-pay for the back/neck pain follow-up treatment.

252. On April 19, 2018, plaintiff filed an Inquiry/grievance requesting a refund in the amount of $10 as the co-pays charged for the follow-up medical visits on March 28, 2108 and April 02, 2018 were unwarranted. On May 11, 2018, Susan Spingler answered, "A request for refund of $10 will be sent to the business office," but to no avail.

253. On May 05, 2018, plaintiff made a Second request/complaint for the unwarranted $10 co-pay charged to his account  as the deducted money for co-pays was causing him hardship, i.e., "preventing me [plaintiff] form spending the most needed money on other important matters," such as, by food, tooth paste, etc. As a result, on May 15, 2018, plaintiff was refunded $10.

254. On July 07, 2018 for the Fourth (4) time, plaintiff were recharged $5 co-pay for the follow-up consultation on March 28, 2018, which was refunded to him on May 15, 2018, for his back/neck pain issues.

255. On July 12, 2018, pursuant to plaintiff's grievance on July 10, 2018 regarding Nurse Ebo's denial of medical treatment after the injurious van rides, plaintiff had a follow-up

consultation with Nurse Vetereni (phonetic) for his back/neck
pain issues. Nurse advised plaintiff that he will be called back
to  see a provider within Seven (7) days and there will be no co-
pays charged "for this visit  and to see the provider" as these
visits were follow-up for neck/back nerve pain issues. Plaintiff
reminded the nurse that he has been charged  unwarranted co-pays
for his ongoing follow-up medical treatments for his neck/back
nerve pain issues and begged the nurse not to charge co-pay as it
will cause him severe hardship. The nurse answered, "I will
forward your message to my supervisor."

256. On July 30, 2018, for the Fifth (5) time, plaintiff was
charged $5 co-pay for his neck/back pain issues for the
consultation with the provider on July 25, 2018. On this day,
plaintiff confirmed with the provider, so that there is no
misunderstanding or mistake being made, that there was  not going
to be co-pay charged for the visit. Plaintiff was assured by the
provider  that there will be no co-pay charged "for this visit"
when plaintiff had described him the hardship that he will be
enduring.

257. On August 03, 2018, plaintiff filed an
Inquiry/Grievance addressing that he has been charged unwarranted
co-pays for non-medical reasons and in retaliation since May of
2018. Therefore, plaintiff requested for an investigation of the
co-pay issue, then refund plaintiff. On August 03, 2018, Susan

Spingler responded that "Your recent charges form 5/2018 forward are appropriate, (itchy nose, neck/back pain, allergey)[.] Based on review no refund is warranted."

258. On August 15, 2018, plaintiff filed a grievance not only requesting to refund the unwarranted co-pays charged to plaintiff as stated on paragraphs 249 through 255, but also to stop charging unlawful co-pays in retaliation for filing grievances and to deter plaintiff from seeking adequate medical treatments for non-medical reasons. On August 19, 2018, Nurse Susan Spingler responded, "Policy is to charge for requested medical services. ... There are all appropriate charges covered by policy. ..." On August 21, 2018, plaintiff appealed Nurse Springler's response explaining in detail that the co-pays were unwarranted. On August 29, 2018, Maggie Reed upheld Nurse Springler's decision justifying the unwarranted co-pays charged to plaintiff's account.

259. On August 30, 2018, plaintiff filed an Inquiry/Grievance requesting to speak with the New Jersey State Prison ("NJSP") medical director to personally address the illegal practices of charging unlawful co-pays and denial of adequate medical treatment for nerve pain, but to not avail.

260. On September 17, 2018, plaintiff was falsely charged $8 for prescriptions, which was not even prescribed to him, causing him hardship in many form, shape, and manner.

261. On September 22, 2018, plaintiff filed a grievance with the Central Office requesting to direct the NJDOC medical department to stop charging plaintiff unlawful co-pays and stop denying adequate medical treatments in retaliation, for non-medical reasons, and to refund the unlawful co-pays, but to no avail; and on October 19, 2018, Central Office responded "This matter is being referred to the Central Office Revenue Unit for review and response."

262. On October 15, 2018, plaintiff received a response to his  Inquiry/Grievance filed on August 30, 2018 requesting to speak with the NJSP Medical  Director to address the illegal practice of charging co-pays and denial of adequate medical treatments to plaintiff. Nurse Baca responded to plaintiff that he will be seen by Medical Patient Advocate on October 19, 2018.

263. On October 19, 2018, after plaintiff's physical therapy, he had very briefly consulted with Nurse Baca. Plaintiff requested with Nurse Baca privacy from Ofc. Lewis and Ofc. Witfield to discuss issues regarding inadequate medical treatments and the unlawful co-pays. When plaintiff inquired about the unlawful $8 co-pay charged  for prescription, Nurse Baca said, "It was warranted that is why your paying it." Within few minutes consulting with Nurse Baca, Ofc. Witfield interject and ordered plaintiff to "rap it up" and "you need to leave now." When plaintiff pleaded with Nurse Baca and Ofc. Witfield to

afford him more time, Ofc. Lewis said to plaintiff, "Who do you think you're, prince of India? ... You better take your towel head out of here before I lock you up."[8] Plaintiff quickly left for fear of further retaliation.

264. On October 22, 2018, plaintiff filed a complaint addressing Ofc. Witfield's and Ofc. Lewis's interference with his medical affairs. On October 24, 2018 Sgt. Akeish Watters responded, "Officers have the authority to give any orders to inmates that are housed in NJSP...."  On October 24, 2018, plaintiff filed a second complaint/grievance  with the prison administration briefly addressing how Officers' are imposing unlawful restriction on plaintiff's consultation/treatment time with  the medical professionals for non-medical reasons and in retaliation absent any penological interest, but to no avail.

265. On October 24, 2018, plaintiff received a letter from Sharon R. Grahm of NJDOC's Revenue Unit stating that the unlawful co-pays were warranted and "If the patient requests the follow up appointment, there will be a copay."

266. On October 24, 2018, plaintiff filed a grievance with the prison administration addressing Ofc. Witfield's, Ofc. Lewis's, and Ofc. Merrel's ongoing mistreatment/misconduct towards plaintiff, in particular how they continued to interfere

---

[8] Calling a person with an Indian heritage a "towel head" is a derogatory racial slur as the plaintiff is from India.

with plaintiff's medical treatments in retaliation for filing a grievance against them and  the medial professionals, but to no avail.

267. On October 29, 2018, plaintiff appealed the unresolved co-pay issue with Central Office, specifically pointing out how plaintiff was charged an unlawful co-pay of $8 for prescriptions he does not even receive, which was charged  only to cause hardship.

268. On October 30, 2018, for the second time plaintiff consulted with Nurse Baca without privacy. Annoyed Nurse Baca's first statement to plaintiff were "You're a pain in the ass ... you just don't learn when to give up." When plaintiff tried to address issues for not receiving adequate treatment for his nerve pain and requested for a back/neck brace, Nurse Baca said, "put in a sick call slip."

269. Plaintiff then quickly explained,  as he was directed to "make it quick," to Nurse Baca all the unlawful co-pays charged to his account both for neck/back nerve pain  and other medical issues,. Nurse Baca responded, "you will be refunded  $8 co-pay charged on September 17, 2018" and the  "$5 co-pay charged for the second follow-up consultation concerning allergy symptoms on July 6, 2018." Plaintiff objected to Nurse Baca for not refunding all the extra unlawful co-pays charged for his neck/back pain consultation deducted on July  09 and 25, 2018,

Nurse Baca responded, "Go head file a grievance If you don't like it" and instructed officer to direct plaintiff to leave the clinic.

270. On October 31, 2018, Ms. Fairweather's final response to plaintiff's grievance filed with the Central Office on September 22, 2018 concerning unlawful co-pays being charged was "Unfortunately, that was the final response. You will need to contact your private attorney and proceed as advised."

271. On March 27, 2019, for the Sixth (6) time, plaintiff was not only charged $5 co-pay for the follow-up consultation with the provider on March 21, 2019, but also made him wait Twenty Seven (27) days to be seen by a medical professional to address his persistent back/neck nerve pain issues in retaliation and for non-medical reasons.

272. On April 01, 2019, plaintiff filed a grievance with the Central Offices addressing how the plaintiff is being denied adequate medical treatments for his nerve pain and the unlawful co-pays being repeatedly charged to him in retaliation and for non-medical reasons. On April 09, 2019, plaintiff received a response that "This matter is being referred to Health Services here at Central Offices." On April 30, 2019, plaintiff appealed the response requesting  adequate medical treatments for his nerve pain without having to face retaliation and for non-medical reasons. On May 01, 2019, plaintiff received a final response

from Cindy Ford, "...this matter ... will also be forwarded to the  Health Services Unit for review/response," but to no avail.

273. On April 08, 2019, plaintiff filed another grievance with the NJDOC Medical Dept. requesting to provide him adequate medical treatment for his nerve pain and to stop charging unwarranted co-pays in retaliation to cause "severe economical hardship to live in prison as the prison doesn't accommodate me [plaintiff] lot of basic necessities, e.g., toothpaste, tooth-brush, deodorant, clothing items, etc. ..." and lawful meals. In particular, to stop plaintiff from waiting Twenty Seven (27) days to receive medical attention for his severe nerve pain in retaliation and for non-medical reasons. On April 13, 2019, Susan Spingler responded, "We apologize for the delay. ... The charge [co-pay] to your account is correct and will remain."

274. On August 01, 2019, plaintiff filed an electronic Inquiry (not a sick call Form MR-007) inquiring whether or not he could receive some form of strong medication and a back/neck brace to cope with his nerve pain. However, on August 02, 2019, Susan Spingler changed plaintiff's Inquiry Form to a sick call Form MR-007 without plaintiff's consent and stated, "... You will be charged a copay per policy."

275. On August 12, 2019, for the Seventh (7) time, plaintiff was charged $5 co-pay without his consent for the follow-up medical consultation  with the nurse on August 05, 2019, who had

advised plaintiff that he will be called back to see a provider, but to no avail.

276. On August 15, 2019, plaintiff filed another grievance addressing retaliation in the form of charging unlawful co-pays and delaying medical treatments, especially for non-medical reasons. On September 10, 2019, Amy Emrich's final response to plaintiff's grievance that "You can submit a separate inquiry to address your request for [medical] co-payment refund."

277. On September 20, 2019, per Amy Emrich's advise, plaintiff filed an electronic Inquiry/Grievance with the medical department requesting the unwarranted $5 co-pay charged to plaintiff on August 5 or 6, 2019, but to no avail. In fact, the medical department closed plaintiff's inquiry form without even affording him a meaningful response.

278. On September 30, 2019, for the Eighth (8) time, plaintiff was charged an unlawful Ten dollars ($10) co-pay for his back/neck nerve pain (and other medical issue) consultation for the visit on September 25, 2019. Despite the fact Plaintiff pleaded with the provider not to charge him co-pay due to hardship and the hardship being caused  to plaintiff's family financially to support him. Plaintiff was assured that there will be no co-pay charged for the visit and plaintiff  had make sure that there is no misunderstanding or a mistake is being made. The provider advised plaintiff "I will address your concern to my

supervisor" and assured him that there "will be no co-pay charged for  this follow-up."

279. On September 29, 2019, plaintiff filed a grievance with the Central Offices addressing the unwarranted cop-pay of Ten Dollars ($10) charged to plaintiff for inadequate medical treatments, but no avail.

280. On October 17, 2019, plaintiff filed another grievance with the Central Offices addressing the unlawful  charge of the $10 co-pay requesting a refund and to provide adequate medical treatments for plaintiff's ailments. Moreover, requesting the Central office to direct the  medical professionals to render adequate medical treatments without delays and to stop charging unwarranted co-pay for non-medical reasons, but to no avail.

281. On November 25, 2019, plaintiff filed a Third (3) grievance with Cindy Ford of  Central Offices requesting a refund of Ten Dollars ($10) co-pay, which was unlawfully charged to plaintiff for the follow-up visit on September 25, 2019. Particularly, requesting to  direct the medical professionals to stop their illegal practices for non-medical reasons, as it were causing plaintiff sever hardship, especially in the form of "causing strain with family relationship" when requesting for financial support. On December 09, 2019, plaintiff's grievance were closed without a response. On December 09, 2019, plaintiff appealed the Central Office's inaction to redress the issue. On

December 11, 2019, plaintiff received a final response from Cindy Ford that "...I will refer your grievance to the Health Service Unit at Central Office for review," but to no avail.

282. On April 04, 2020, plaintiff filed an electronic sick call Form-Form MR-007 to receive treatment for severe COVID-19 symptoms, which (included but not limited to) unbearable nerve pain on back and neck exacerbated by the Coronavirus, but to no avail. Therefore, on April 07, 2020, plaintiff filed another sick call form to receive medical attention for his severe nerve pain, but to no avail.

283. On April 15, 2020, Nurse Baca responded to plaintiff's request for adequate medical treatment stating "This is a request for medical care and therefore will be treated as a MR007/sick call slip. You will be charged a copay, per policy."

284. On May 01, 2020, plaintiff filed a grievance requesting medical department not to charge a co-pay for it was not warranted but also they took over Fifteen (15) days to consult with plaintiff in response to his repeated request for medial treatment on April 04 and 07 of 2020. On May 06, 2020, Nurse Baca responded that plaintiff was not charged copay for the medical consultation on April 17, 2020.

286. On May 31, 2020, plaintiff submitted a sick call Form MR-007 after his repeated request for adequate medical treatments to treat COVID-19 symptoms (and severe nerve pain) was denied.

287. On June 03, 2020, plaintiff had consulted with Dr. Jane Doe-37 about the exacerbated nerve pain and the a pimple like growth under his tongue due to COVID-19 symptoms. Dr. Doe-37 referred plaintiff to the dental department. After the dentist examined plaintiff's mouth, Sharon Aker had personally advised him "you will not be charged co-pay for this visit," as plaintiff had expressed to Ms. Aker that he will endure severe hardship in different form, shape, and manner.

288. On June 08, 2020, for the Ninth (9) time, plaintiff was charged a Five ($5) dollars co-pay for his severe nerve pain on his back and neck exacerbated by Coronavirus symptoms.

289. On June 10, 2020, plaintiff had filed an Inquiry/Grievance addressing the unwarranted co-pay charged to plaintiff and requested a refund. On June 12, 2020, Ms. Aker responded that "....You are correct about [co-pay] refund since you were already charged. I will take care of that for you," but to no avail.

290. On July 22, 2020, plaintiff filed another grievance requesting to refund the unwarranted co-pay charged to him for the June 03, 2020 consultation, as it is causing plaintiff severe hardship, especially when having to request money from family to meet basic needs within the prison life. On July 22, 2020, Ms. Aker responded that "I am sorry. I did look into it and it was a legitimate [co-pay] charge Doctor addressed your problem and

diagnosed." On August 03, 2020, plaintiff appealed the decision to not refund the unwarranted co-pay charged to plaintiff as  an ongoing retaliation  and for non-medical reasons, but to no avail.

291. On September 29, 2020, plaintiff filed a grievance with the Central Offices addressing the ongoing illegal practice of charging unlawful co-pays and denial of medical treatments in retaliation and for non-medical reasons. In particular, pointing out that no co-pays are to be charged to NJDOC Inmates for medical treatments since April 15, 2020, per State  of New Jersey Governor's Executive Order. On September 29, 2020, R. Formhold responded that "This matter has been referred to Central Offices Health Services."

292. On November 20, 2020, M. Reed wrote to plaintiff that "Per the statewide director of dentistry the business office will be notified to refund the copay" charged him for the June 03, 2020 medical/dental visit. Nonetheless, the act of deducting unlawful co-pays in retaliation and delay in refunding the co-pay for several months had caused plaintiff hardship.

Defendants' Awarness and Deliberate Indifference to the Safety Inadequacies in the NJDOC Vans' Inmate Passenger Compartments, to the Injuries Prisoners are Sustaining in the Vans, and to  the Medical Attention Received for the Injuries With Regard to Prisoners/Plaintiff's Transportation

293. The Defendants, i.e., as stated in paragraphs 9 through 77, are aware that plaintiff (and prisoners) are transported in the NJDOC vans' inmate passenger compartments with design defects, without proper safety features, and are denied proper medical attention for injuries sustained in the NJDOC vans. Despite this knowledge and awareness, the defendants under their supervision continue to transport prisoners and plaintiff in those unsafe NJDOC vans, sometimes repeatedly with the knowledge of severe disabilities and with severe injuries are being sustained subjecting prisoners to wanton pain and suffering.

294. The defendants, i.e., as stated in paragraphs 9 through 77, are also aware that NJDOC's grievance process fails to take account the prisoners' and plaintiff's repeated complaints made to the defendants with regard to the NJDOC van's unlawful safety problems and the dangerous driving are causing prisoners and plaintiff severe life long injuries. Moreover, the plaintiff was intentionally denied proper medical treatments by the Defendants for a prolonged period for the severe nerve pain derived from the repeated injuries suffered in the NJDOC vans.

295. In December 12, 2014, plaintiff for the first time had filed a complaint with regard to plaintiff's safety while being transported in the NJDOC vans due to design defects, no safety features, and reckless/dangerous driving. Plaintiff made subsequent complaints to inform the defendants about the NJDOC

vans' safety inadequacies (including but not limited to) on

October 10, 2016 to the NJDOC Custody; on October 26, 2016 to the

NJDOC Central Offices; On August 05, 2018 to NJDOC Custody; and

on November 10, 2020 to NJDOC Administration.

296. On November 29, 2018, the Public Advocate, through the

People's Organization for Progress, informed NJDOC's Acting

Commissioner Marcus O. Hicks and to some of his senior NJDOC

Staff (to be named upon Discovery) during a meeting the serious

safety problems with the prisoners' NJDOC transportation vans.

During this meeting, the defendants become aware of the severe

problems with the NJDOC vans' safety issues and the injuries

prisoners were sustaining while being transported.

297. In a letter dated December 20, 2018, which is annexed

here to as Exhibit B1 to B5, Jean Ross, an attorney  of People's

Organization for Progress and Bonnie Kerness Director of AFSC

Prison Watch Program further informed  prisoners' testimonies to

Marcus O. Hicks, acting Commissioner of the NJDOC by Letter:

> "[W]e are sending you under separate cover, testimonies
> of the experiences of prisoners in the NJDOC
> transportation vans."

Some of those testimonies (including but not limited to) of

prisoners are the following:

> "These vehicles are unsafe because a person is bounced
> around inside. ...The [waist] straps connected to the
> seats cannot be used because there is not enough space
> for an officer to  step inside the van to strap a
> person in. So they tell the inmate to grab and hold on

to the strap. Yet, the inmate has handcuffs with a pressure belt around his waist. If a person has back problems, it will be seriously aggravated."

"In 2012, I went to the urologists to have a procedure done and was literally taken to the van immediately after coming out of the recoverey room from anesthesia. Furthermore, I was not allowed to have a urine bottle and was forced to urinate on the floor of the van."

"I was diagnosed with congestive heart failure and have trouble breathing in back of new D.O.C. [vans]. When I am placed in vans it was very hot in back of van and I started experience chest pain shortness of breathing and started sweating uncontrollable...I was about to pass out, very hot, not enough space, and no ventilation."

"Why they [the NJDOC] have not done anything about the vans even though so many people have complained. Nobody gives a shit about a bunch of convicts."

"The new vans, "have no windows, we R put inside a metal box inside the van it's a metal divider in the vans were they sit 4-people on 1-side & 4 on the other[.]"

"There are [waist] seat belts in the back of the van, but we [prisoners] can not put them on because we have a chain around our waist, and then handcuffed around to this chain. The cops are suppose to belt us in but never do. So if the van is packed your bouncing off each other. ...[B]y yourself, ...then you are being thrown all over the place. You can [not] brace your self because of the way your are chained. ...I came back with a couple bruises just going from Trenton state prison To St. Frances  (sic) hospital whic (sic) is only a few miles away."

"My health has gotten worse due to the neglect of medical attention and I needed to go to many trips to see specialist. I needed to go to these trips, but the thought of the pain, torture and horror, I had to refuse. The horror of it all outweighed the necessity of these medical needs."

"They [the NJDOC] braught (sic) a younger guy [an
inmate] in with fesies all down the back of his pants.
The van driver did not only refuse to stop but also
refused to let the prisoner use the bathroom before
they left wear they were coming from. ... He [the
prisoner] was in the middle, the vans are packed so
tight that you are litterally squized against each
other. So the prisoners on either side of him also were
it [the fesies]."

"I've filed complaints to no avail. I've M.S. & the
vans R not ADA accessible, that's my biggest complaint.
At one point, 'no  seatbelts'. Now they have 'em [waist
seat belt] but the C.O.'s DON't buckle us in."

### Deliberate Indifference to Plaintiff's Medical Needs

298. The Defendants, i.e., as stated in paragraphs 9 through

77, are aware and had knowledge that plaintiff (and prisoners)

was sustaining severe life long injuries to his body while

transported in the NJDOC vans since year 2014 to present due to

reasons stated in paragraphs 80 through 93. On the following

dates (including but not limited to), plaintiff made the

defendant medical professionals aware and requested for proper

medical treatments for the pain and the repeated injury suffered

in the NJDOC vans:

299. In November or December of 2014, when plaintiff

complaint to Nurse Jane Doe-5 that he was in pain because he was

bounced around in the NJDOC van due to design defects, no safety

features, and dangerous driving. Nurse Doe-5 responded to

plaintiff, "Everybody is complaining about the new vans ... it's

[the pain's] nothing ... it will go away in few days ... you're not used to travel like this. ..."

300. In October 20, 2106, when plaintiff conveyed to Nurse Jane Doe-8 that he was in pain after sustaining injuries in the NJDOC transportation vans, Nurse Doe-8 said, "There is nothing I could  do for you ... it [the pain] will go away soon."

301. On March 03, 2018, plaintiff complaint to NP. Verdeflor that he was experiencing "sharp nail stabbing and burning" pain on his back and neck region due to the injuries suffered while transported in the NJDOC vans. On this day, plaintiff was not at all examined or treated for his severe nerve pain was dismissed.

302. On June 29, 2018, after plaintiff had experienced several injurious NJDOC van transportation, plaintiff's repeated cry for proper medical attention for his back and neck pain  was intentionally denied by Nurse Ebo and Ofc. Lewis. When Plaintiff request to speak with Nurse Ebo's supervisor, he was threatened to be sent to lock-up.

303. On January 10, 2019, plaintiff conveyed to Dr. Miller his severe nerve pain issues as a result of repeated injuries suffered during transportation in the NJDOC vans. However, plaintiff was quickly dismissed without even conduction any examination for nerve pain, and advised him that he was suffering from early stage arthritis.

304. Despite the knowledge and awareness of these prisoners' testimonies of grievances through the public advocate and the plaintiff's repeated filing of grievances, to this date, (a) defendants had failed to correct any of the reported safety inadequacies with the NJDOC vans, the unsanitary conditions in the compartments, rough ride assaults, dangerous and reckless driving by the NJDOC officers, and (b) intentionally delaying plaintiff proper medical treatments for the injuries suffered in the NJDOC vans in retaliation for filing grievances and for non-medical reasons.

## CAUSES OF ACTION

Plaintiff was Subjected to Cruel and Unusual Punishment in Violation of the Eighth Amendment to the Constitution.

### COUNT 1

305. Plaintiff repeats and realleges paragraphs 1 through 304 above as if the same had been set forth herein. Defendants NJDOC and UCHC, acting under color of law, had a policy, practice or custom in place that enabled its agents and employees to act with deliberate indifference to the constitutional rights of plaintiff (and prisoners) by knowingly tolerating misconduct by its officers and employees, encouraging misconduct by failing to adequately supervise, discipline, or train.

### COUNT 2

306. Plaintiff repeats and realleges paragraphs 1 through 305 above as if the same had been set forth herein. Defendants

NJDOC and UCHC, acting under color of law, violated plaintiff's (and prisoners') First Amendment right to be free from retaliation and Eighth Amendment right to be free from cruel and unusual punishment, through policy, practice or custom; or implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct that deliberately subjects plaintiff (and prisoners):

(a) To travel in the NJDOC vans' passenger compartments that are void of proper safety features and with design defects, which resulted in sustaining life long painful injurie(s) to plaintiff's C5-C6 level; and

(b) To travel in the passenger compartments in unsanitary conditions or with human waste and its strong smell without adequate ventilation; and

(c) To travel without lighting or windows for prolonged period that subjects plaintiff (and prisoners) to sensory deprivation amounting to torture; and

(d) To travel in severe pain from holding in the human waist for prolonged period when transport officers deny the use of bathroom; and denying prisoners of basic human needs, particularly, the need to eliminate bodily waste in a sanitary environment is forcing prisoners to involuntarily defecate or urinate in the inmate passenger compartment, which sometimes results in unlawful disciplinary action; and

(e) To travel without access to any meal during prolonged transportation or transfer; and

(f) To travel by requiring to sit in an abnormal posture in severe pain for prolonged period of time while plaintiff was (and will be) in full and total restraints in the unsecured and flawly designed NJDOC vans' passenger compartments, despite plaintiff's (and prisoners') repeated verbal and written complaints to the Defendants of his back/neck pain and his repeated request to be transported in a safe NJDOC transportation vehicle; and

(g) To rough ride assault by means of reckless driving, deny a meal  and/or the use of bathroom when complaing to the transport officers for their misconduts and for thier denial of a lawful request; and

(h)  To  require traveling in severe pain and suffering by denying adequate transportation accommodation to plaintiff (and prisoners) due to his life long injury or disability; and

(i) To deny proper medical examination and treatments for the painful injuries suffered during the transportation in the NJDOC transportation vans or in other NJDOC vehicles; and

(j) To retaliation for filing grievances addressing denial of proper medical treatments by inflicting economical hardship (charging unwarranted co-pays) and  by delaying proper medical treatments for nerve pain in many form, shape, and manner; and

(k) To confine in a condemned unit infested with rodent feces and roaches, with human bodily waste on the floor and the wall, with dirt and dust, and in a hot and humid cell while severely suffering from deadly Coronavirus symptoms and severe nerve pain without affording any minimal medical attention for pain and suffering.

## COUNT 3

307. Plaintiff repeats and realleges paragraphs 1 through 306 above as if the same had been set forth herein. Defendants Gary M. Lanigan, Marcus O. Hicks, Sharon R. Graham, Tiffany Fairweather, Bruce Davis, Amy Emrich, Richard Defazio, Dr. Nwachukwu, Xiangrong Zhou, Cindy Ford, Akeisha Watters, Craig Sears, Maggie Reed, Jonathan Gramp, Fathom Borg, Susan Spingler, Mervin Ganesh, Jane Doe-26, John/Jane Doe-30, John/Jane Doe-39, John/Jane Doe-40, John/Jane Doe-41, John/Jane Doe-42, and John/Jane Doe-43, acting under color of law, had a policy, practice or custom in place that enabled their agents and employees to act with deliberate indifference or with reckless disregard to the constitutional rights of plaintiff (and prisoners) by knowingly (a) tolerating misconduct by their officers and employees, encouraging misconduct by failing to adequately supervise, discipline, or train; and (b) by implementing the  defendants NJDOC's and UCHC's unconstitutional policy, practice or custom.

## COUNT 4

308. Plaintiff repeats and realleges paragraphs 1 through 307 above as if the same had been set forth herein. Defendants Gary M. Lanigan, Marcus O. Hicks, Tiffany Fairweather, Bruce Davis, Amy Emirich, Richard Defazio, Dr. Nwachukwu, Xiangrong Zhou, Cindy Ford, Craig Sears, Maggie Reed, Jonathan Gramp, Fathom Borg, Susan Spingler, Diane Baca, Mervin Ganesh, Jane Doe-26, John/Jane Doe-30, John/Jane Doe-39, John/Jane Doe-40, John/Jane Doe-41, John/Jane Doe-42, and John/Jane Doe-43, acting

under color of law, violated plaintiff's Eighth Amendment right to be free from cruel and unusual punishment, through policy, practice, custom; or implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct which places plaintiff in unconstitutional conditions of confinement by:

(a) Transporting in the NJDOC van's passenger compartments that are void of proper safety features and with design defects, which resulted in receiving life long painful injurie(s) to plaintiff's C5-C6 level; and

(b) Forced plaintiff to travel in passenger compartments in unsanitary conditions or with human waste and its strong smell without adequate ventilation; and

(c) Transport without lighting or windows that subjects plaintiff to sensory deprivation; and

(d) Denying the use of bathroom subjects plaintiff to severe pain from holding in the human waist for prolonged period; and

(e) Denying a meal; and

(f) Requiring plaintiff to sit in an abnormal posture with severe pain while receiving repeated injuries to the upper-body for prolonged period of time while plaintiff was in full and total restraints in the unsecured and flawly designed passenger compartments, despite plaintiff's repeated verbal and written complaints to the Defendants of his severe back/neck pain and his repeated request to be transported in a safe NJDOC van; and

## COUNT 5

309. Plaintiff repeats and realleges paragraphs 1 through 308 above as if the same had been set forth herein. Defendants

Officer Becker, John Doe-1, John Doe-2, John Doe-7, John Doe-9, John Doe-10, John Doe-12 John Doe-13, John Doe-14, John Doe-15, John Doe-18, John Doe-19, John Doe-21, John Doe-22, John Doe-27, John/Jane Doe-28, and John/Jane Doe-29, acting under color of law, acted willfully, deliberately, maliciously, or with reckless disregard for plaintiff's clearly established constitutional rights, violated plaintiff's Eighth Amendment right to be free from cruel and unusual punishment, by implementing the defendant NJDOC's unconstitutional policy, practice, or custom.

### COUNT 6

310. Plaintiff repeats and realleges paragraphs 1 through 309 above as if the same had been set forth herein. Defendants John Doe-1, John Doe-2, John Doe-7, John Doe-10, John/Jane Doe-28, acting under color of law, violated plaintiff's Eighth Amendment right to be free from cruel and unusual punishment, by using unreasonable, unnecessary and excessive force, by retaliating with reckless driving ("rough ride assault") when plaintiff (and prisoners) complained of going airborne from seat and falling hard on the floor or on the steel seat; and when complained of pain.

### COUNT 7

311. Plaintiff repeats and realleges paragraphs 1 through 310 above as if the same had been set forth herein. Defendants Officer Becker, John Doe-1, John Doe-7, John Doe-9, John Doe-12, John Doe-13, John Doe-14, John Doe-15, John Doe-18, John Doe-19, John Doe-21, John Doe-22, and John Doe-28, acting under color of law, violated plaintiff's Eighth Amendment right to be free from

cruel and unusual punishment, when the defendants acted with deliberate indifference or with reckless disregard to plaintiff's safety, as they deliberately had denied plaintiff's request for assistance to strap on the safety waist seat belt; thereafter, defendants subjected plaintiff to reckless driving and dangerous driving, causing plaintiff to receive painful injury, while the defendants retained awareness and knowledge that the plaintiff was transported fully restrained without any safety protection from bouncing around or going airborne.

COUNT 8

312. Plaintiff repeats and realleges paragraphs 1 through 311 above as if the same had been set forth herein. Defendants Jane Doe-5, Jane Doe-8, Jane Doe-11, Mobolanle Ebo, Jane Doe-20, Officer Lewis, and John/Jane Doe-23, acting under color of law, acted willfully, deliberately, maliciously, or with reckless disregard for plaintiff's clearly established constitutional rights, violated plaintiff's Eighth Amendment right to be free from cruel and unusual punishment (a) when deliberately denied plaintiff's repeated requests for medical care for painful injuries on his back and neck after transportation to and from Court, and (b) by implementing the NJDOC's and UCHC's unconstitutional policy, practice, or custom.

COUNT 9

313. Plaintiff repeats and realleges paragraphs 1 through 312 above as if the same had been set forth herein. Defendants Paulo Verdeflor, Jane Doe-4, Dr. Jane Doe-17, Jane Doe-16, Dr. Coffman, Dr. Robin Miller, and Dr. Jane Doe-37, and Dr. John Doe-

38, acting under color of law, violated plaintiff's Eighth
Amendment right to be free from cruel and unusual punishment,
when the defendants acted with deliberate indifference or with
reckless disregard to plaintiff's severe neck/back injury and  to
his excruciating nerve pain:

(a) when defendants intentionally ignored plaintiff's
repeated complaint of receiving neck/back injury during
transportation; and

(b) when defendants deliberately not conducted the minimal
medical examination to render treatment for the severe nerve pain
on plaintiff's back and neck region; and

(c) when defendants deliberately denied plaintiff's repeated
requests for a neck and a back brace in order to reduce strain on
the injury to alleviate the severe nerve pain on back/neck
region, which would have enabled plaintiff to perform one or more
major daily activity without experiencing severe nerve pain; and

(d) when intentionally denied and delayed proper medical
examination and treatments for excruciating nerve pain for   non-
medical reasons to cut costs.

## COUNT 10

314. Plaintiff repeats and realleges paragraphs 1 through
313 above as if the same had been set forth herein. Defendants
Marcus O. Hicks, Bruce Davis, Amy Emirich, Dr. Nwachukwu,
Xiangrong Zhou, Cindy Ford, Craig Sears, Maggie Reed, Susan
Spingler, Diane Baca, Jane Doe-26, John/Jane Doe-30, Ofc. John
Doe-35, Ofc. John/Jane Doe-36, Dr. Jane Doe-37, and John/Jane
Doe-4, John/Jane Doe-39, acting under color of law, violated

plaintiff's Eighth Amendment right to be free from cruel and unusual punishment, through policy, practice, custom; or implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct which places plaintiff in unconstitutional conditions of confinement:

(a) Required plaintiff to confine/quarantine for Ten (10) days in a condemned Unit, while tested positive with deadly COVID-19, under unsanitary conditions of: (1)  human bodily fluid/waist on the cell walls and floor; (2) infested with feces of rodent and roaches; (3) with dirt and dust; (4) in a hot and humid Unit and cell without ventilation; and

(b) Required plaintiff to confine/quarantine: (1) without access to adequate medical treatments by denying him access to medical forms; (2) by repeatedly denying plaintiff access to a qualified medical professional to treat  his severe nerve pain, painful symptoms associated with COVID-19, and severe mental distress;

<u>Retaliation in Violation of the First
Amendment to the U.S. Constitution</u>


COUNT 11

315. Plaintiff repeats and realleges paragraphs 1 through 314 above as if the same had been set forth herein. Defendants Sharon R. Graham, Susan Spingler, Dr. Nwachukwu, Xiangrong Zhou, Officer Merrel, Officer Witfield, Officer Lewis, Cindy Ford, Diane Baca, Amy Emrich, Tiffany Fairweather, Maggie Reed, Mervin Ganesh and Sharon Aker, acting under color of law, violated plaintiff's First Amendment right to free speech or the right to

petition the Government for redress when they enforced NJDOC's

and UCHC's unconstitutional policy, practice or custom by

conspiring (a) to repeatedly charge unwarranted co-pays, (b) to

deny, to delay, or to deter plaintiff from requesting  proper

medical treatments for his severe nerve pain with the intention

of inflicting severe economic hardship, pain, and suffering on

plaintiff in retaliation for plaintiff had repeatedly complained

and filed grievances about defendants'  unlawful and

unconstitutional practices:

  (1) of charging unwarranted co-pays; and

  (2) of denying proper medical treatments (sometimes for up

to 27 days) for severe back and neck nerve pain; and

  (3) of canceling plaintiff's requested medical treatment for

severe nerve pain without affording him a chance to consult with

a medical professional; and

  (4) of the hostile misconduct by the defendants toward the

plaintiff.

### COUNT 12

  316. Plaintiff repeats and realleges paragraphs 1 through

315 above as if the same had been set forth herein. Defendants

Officer Becker, John Doe-1, John Doe-2, John Doe-7, John Doe-10,

John Doe-14, and John/Jane Doe-28, acting under color of law,

violated plaintiff's First Amendment right to free speech or  the

right to petition the Government for redress  (a) when plaintiff

was subjected to "rough ride assault" (b) when denied plaintiff

the  use of bathroom to eliminate bodily waste with the intention

of inflicting severe ▇▇▇▇▇▇ hardship, pain, and  suffering on

plaintiff in retaliation for plaintiff had repeatedly complained to defendants' the unconstitutional practices: (1) of driving recklessly; (2) of causing pain from dangerous driving.

### Violation of the Americans with Disabilities Act of 1990

#### COUNT 13

317. Plaintiff repeats and realleges paragraphs 1 through 316 above as if the same had been set forth herein. Defendants Gary O.  Lanigan, Marcus O. Hicks, Jonathan Gramp, Fathom Borg, Amy Emrich, Susan Spingler, Diane Baca , Dr. Nwachukwu, Jane Doe-39, John/Jane Doe-40, John/Jane Doe-41, John/Jane Doe-42, and John/Jane Doe-43 have discriminated against plaintiff  (and prisoners) in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12132 by:

(a) failing to reasonably accommodate plaintiff's handicap of painful neck injury by not providing adequate and safe transportation without causing severe pain; and by

(b) transporting plaintiff (and prisoners) without proper safety features and with design defect in the NJDOC van by having no regard for his safety and painful neck/back injury; and by

(c) repeatedly denying plaintiff access to adequate medical treatments for the painful nerve pain injuries received during transportations in the NJDOC vans.

### Violation of 504 of the Rehabilitation Act of 1973

#### COUNT 14

318. Plaintiff repeats and realleges paragraphs 1 through 317 above as if the same had been set forth herein. Defendants Gary Lanigan, Marcus O. Hicks, Jonathan Gramp, Fathom Borg, Amy

Emrich, Susan Spingler, Diane Baca, Dr. Nwachukwu, Jane Doe-39, John/Jane Doe-40, John/Jane Doe-41, John/Jane Doe-42, and John/Jane Doe-43 have discriminated against plaintiff (and prisoners) in violation of § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, as amended by the Civil Rights Restoration Act of 1987 by:

(a) failing to reasonably accommodate plaintiff's handicap of painful neck injury by not providing adequate and safe transportation without causing severe nerve pain by requiring to sit in a bow posture; and by

(b) transporting plaintiff (and prisoners) without proper safety features and with design defect in the NJDOC van by having no regard for his painful neck and back injury; and by

(c) denying plaintiff access to adequate medical treatments for the painful injuries received during transportation.

### Racial Discrimination in Violation of the Fourteenth Amendment to the U.S. Constitution

## COUNT 15

319. Plaintiff repeats and realleges paragraphs 1 through 318 above as if the same had been set forth herein. Defendants Officer Lewis, Officer Witfield, and Diane Baca, acting under color of law, intentionally discriminated against plaintiff because of his race in violation of Fourteenth Amendment and State Constitutional rights to be free from racial discrimination (a) by denying plaintiff  access to adequate medical treatments, and (b) by preventing and restricting plaintiff's  medical

consultation and/or consultation time because plaintiff is a "towel head" from India.

### Violation of the Due Process Clause of the Fourteenth Amendment

#### COUNT 16

320.  Plaintiff repeats and realleges paragraphs 1 through 319 above as if the same had been set forth herein. Defendants Gary M. Lanigan, Marcus O. Hicks, John/Jane Doe-6, John/Jane Doe-40, John//Jane Doe-41, John/Jane Doe-42, John/Jane Doe-3, Tiffany Fairweather, Amy Emrich, Richard Defazio, Cindy Ford, Dr. Nwachukwu, Diane Baca, Susan Spingler, Mervin Ganesh, Jonathan Gramp, Bruce Davis, and Fathom Borg have violated plaintiff's (and Prisoners) due process rights under the Fourteenth amendment by: (a) failing to ensure that plaintiff (and prisoners) is not in severe physical pain and/or have a disability/injury in order to be transported in the new NJDOC vans; (b) by failing to take any action to ensure that the plaintiff (and prisoners) is transported in a safe NJDOC vehicles despite their repeated grievances; (c) by failing to correct any and all the safety inadequacies in the new NJDOC vans to ensure plaintiff (and prisoner) is transported safely; and (d) by failing to ensure palintiff was receiving proper medical treatments for his neck injury and severe nerve pain without lengthy delay.

### Breach of Contract, Pursuant to N.J.S.A. 2A:15-2

#### COUNT 17

321. Plaintiff repeats and realleges paragraphs 1 through 320 above as if the same had been set forth herein. Defendants

Havis Inc. and John/Jane Doe (CEO) had breached its contract with
NJDOC by failing to built and provide/sell the inmates' passenger
compartments with adequate safety features and without the design
defects required by the contract, thereby causing life long and
irreparable painful injury, suffering, and severe pain to
plaintiff, who is the intended third-party beneficiary of the
contract.

### Breach of Contract, Pursuant to N.J.S.A. 2A:15-2

#### COUNT 18

322. Plaintiff repeats and realleges paragraphs 1 through
321 above as if the same had been set forth herein. Defendant
UCHC and its designated medical professionals had breached its
contract with NJDOC by failing to provide the medical services
required by the contract, thereby causing severe pain,
suffering, and injury to plaintiff, who is the intended third-
party beneficiary of the contract.

### Other Federal and State Claims

#### COUNT 19

323. Plaintiff repeats and realleges paragraphs 1 through
322 above as if the same had been set forth herein. Plaintiff's
life long painful injurie(s) was caused by the deliberate action
and/or by the negligence of defendants Havis Inc. and John/Jane
Doe (CEO), acting under color of law, to design, construct and
provide/sell passenger compartments without proper safety
features and with design defects to the NJDOC for plaintiff's
transportation; and

#### COUNT 20

324. Plaintiff repeats and realleges paragraphs 1 through 323 above as if the same had been set forth herein. Plaintiff's injuries were caused by defendants Havis Inc.'s and John/Jane Doe's (CEO) breach of its and his/her absolute duty, acting under color of law, to built and provide/sell an inmate transportation-worthy passenger compartments without the unlawful and unconstitutional conditions, as described in paragraphs 81 through 93, to the NJDOC for plaintiff's transportation; and

### COUNT 21

325. Plaintiff repeats and realleges paragraphs 1 through 324 above as if the same had been set forth herein. Under any and all the applicable Federal and State passenger transportation safety laws and regulations, defendants Havis Inc. and John/Jane Doe (CEO) had a duty, acting under color of law, to design, construct, and sell inmate passenger compartments with proper safety features and without design defects to the NJDOC for plaintiff's (and prisoners') transportation. Defendants Havis Inc. and John/Jane Doe (CEO) had breached that duty when it designed, constructed, and sold the inmate passenger compartments to the NJDOC for plaintiff's transportation without proper safety features and with design defects as stated in paragraphs 81 through 93; and

### New Jersey Products Liability Act

### COUNT 22

326. Plaintiff repeats and realleges paragraphs 1 through 325 above as if the same had been set forth herein. Under the New Jersey Products Liability Act, defendants Havis Inc. and

John/Jane Doe (CEO) had a duty, acting under color of law, to design, construct, and sell inmate passenger compartments with proper safety features and without design defects to the NJDOC for plaintiff's (and prisoners') transportation. Defendants Havis Inc. and John/Jane Doe (CEO) had breached that duty when they deliberately or negligently designed, constructed, and sold the inmate passenger compartments to the NJDOC for plaintiff's transportation under unlawful and unconstitutional conditions as stated in paragraphs 81 through 93.

### PRAYER FOR RELIEF

327. Plaintiff repeats and realleges paragraphs 1 through 326 above as if the same had been set forth herein. Plaintiff (and prisoners) have no adequate remedy at law to redress the wrongs set forth in this complaint. Plaintiff have suffered and will continue to suffer irreparable injury as a result of the unlawful acts, inactions, omissions, policies, and practices of the defendants as alleged herein, unless the plaintiff (and prisoners) is granted the relief he requests.

WHEREFORE, plaintiff respectfully prays that this Court:

A. Declare that the acts, inactions, omission, policies, and practices described herein violated plaintiff's rights under the Constitution and the laws of the United States and the State;

B. Issue an injunction ordering the following to the defendants:

1. To immediately accommodate plaintiff proper medical treatments for his ongoing back/neck nerve pain and injury:

(a) without delays;

(b) without further charging unlawful co-pays;

(c) by accommodating a back and a neck brace to alleviated strain and pain while working and engaging in one or more major daily activities;

(d) by accommodating a table and a chair in plaintiff's cell (or assign a single-lock-lock cell with proper chair and table) to properly sit with back support and perform activities without experiencing severe nerve pain;

(e) by accommodating plaintiff a medical pillow and a medical mattress to alleviate severe nerve pain and numbness while sleeping or laying down; and

2. Order defendants to immediately stop transporting plaintiff to and from hospitals, Court trips, and other locations in the NJDOC vans' passenger compartment with design defects and without any safety features; and

3. Order defendants to immediately correct the NJDOC vans' design defects and the void of proper safety features by:

(a) redesigning and reconstructing the inmates' passenger compartment by enabling inmates to be seated in a forward-looking direction rather than seated side ways looking inside;

(b) correcting the design defect of the angled upper side wall in the compartment that causes inmates to sit in a painful abnormal posture and enable inmates's to sit up straight (<u>See</u> Exhibit A1);

(c) installing shoulder seat belts and waist seat belts in all NJDOC inmate transportation vans and other vehicles;

(d) installing safety upper body and head padding or cushion in the compartments; and install safety cushion on steel seats;

(e) correcting the air ventilation system in the inmate passenger compartments;

(f) installing adequate window in the inmates passenger area;

(4) Immediately order defendants to maintain inmates' transportation vans and other vehicles in sanitary conditions at all time; and

(a) afford prisoners an opportunity to use bathroom frequently during transportation;

(5) Immediately order defendants to stop subjecting inmates to rough ride assaults in retaliation:

(a) for seeking assistance to strap on seat belts;

(b) for requesting to use the bathroom;

(c) for requesting to stop driving recklessly and dangerously;

(d) for requesting a meal/food;

(e) for requesting to transport in a sanitary inmate passenger compartment;

(f) for addressing a complaint in any form, shape, and manner with regarding the NJDOC's inmate transportation vehicles and how inmates are being transported; and

(6) Order defendants to refrain from present and future retaliation towards plaintiff in any form, shape, and manner for filing this civil action (including but not limited to) by: (a) not moving him to a double-lock cell, especially with an

incompatible prisoner; (b) not terminating the prison job; (c) not conducting unlawful search and seizure of plaintiff, his cell, and his property; (d) not seize and destroy personal effects (including legal documents and word-processor); (e) not placing contraband in cell to issue an institutional infraction to send to lock-up; (f) not transfering to another prison or state; (g) not further denying or delaying of proper medical, dental, and mental health treatments when warranted; (h) not tampering with both incoming and outgoing mails; (i) not directing or influencing mental health department to falsely declare plaintiff as mentally incompetent and/or dangerous to himself or others to punish, and to prevent further pursuit of this lawsuit; (j) not influencing or directing other NJDOC officials or any other person to retaliate directly and/or indirectly in any form, shape, or manner, which is not specifically stated herein.

C. Order each defendant to pay nominal damages, $50,000 in compensatory damages, and $100,000 in punitive damages;

D. Order defendant Havis Inc. and John/Jane Doe (CEO) to pay a total of $3000,000; and order all other defendants to collectively pay $1000,000 for past, present, and future physical pain and suffering;

E. Order defendant Havis Inc. and John/Jane Doe (CEO) to pay $3000,000; and order all other defendants to collectively pay $1000,000 for past, present and future mental anguish and distress;

F. Order defendant Havis Inc. and John/Jane Doe (CEO) to pay $3000,000; and order all other defendants to collectively pay $2000,000 for loss of future earning capacity;

G. Order defendants to pay reasonable attorney fees and costs; and

H. Retain jurisdiction in this case until the unlawful and unconstitutional conditions and practices as alleged herein no longer exist and the Court is satisfied that they will no longer occur.

I. Grant other just and equitable relief that this Honorable Court deems necessary.

CERTIFICATION

I certify under the penalty of perjury that the foregoing complaint is true and to the best o my information, knowledge, and belief.

Signed this _03_ day of _March_ , 2021.

Joseph M. Pallipurath, Pro se
SBI#431700E
New Jersey State Prison
P.O. Box 861
Trenton, NJ 08625